## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| _____ ) | |
| NEXTEEL CO., LTD.,                                  ) | |
|                                                                ) | |
|                      **Plaintiff,**                        ) | |
|                                                                ) | |
| HYUNDAI STEEL COMPANY and SEAH STEEL ) | |
| CORPORATION,                                      ) | |
|                                                                ) | |
|                  **Consolidated Plaintiffs,**     ) | **NON-CONFIDENTIAL** |
|                                                                ) | |
|              **and**                                        ) | |
|                                                                ) | |
| HYUNDAI STEEL COMPANY,                   ) | |
|                                                                ) | |
|                   **Plaintiff-Intervenor,**       ) | |
|                                                                ) | |
|              **v.**                                         ) | **Consol. Court No. 20-03868** |
|                                                                ) | |
| UNITED STATES,                                     ) | |
|                                                                ) | |
|                   **Defendant,**                       ) | |
|                                                                ) | |
|              **and**                                        ) | |
|                                                                ) | |
| WHEATLAND TUBE COMPANY and NUCOR ) | |
| TUBULAR PRODUCTS INC.,                     ) | |
|                                                                ) | |
|                 **Defendant-Intervenors.**        ) | |
| _____) | |

---

### DEFENDANT'S RESPONSE TO PLAINTIFFS'
### MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

---

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

OF COUNSEL:
JONZACHARY FORBES
U.S. Department of Commerce
Office of Chief Counsel for
Trade Enforcement and Compliance
1401 Constitution Avenue, NW.
Washington, DC 20230-0001
Telephone: (240) 449-5906
Facsimile: (202) 482-8184
Email: JonZachary.Forbes@trade.gov


June 1, 2021

FRANKLIN E. WHITE, JR.
Assistant Director

ROBERT R. KIEPURA
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 305-4436
Fax:          (202) 353-0461
Email:        Robert.Kiepura@usdoj.gov

*Attorneys for Defendant*

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ..................................................................2

    I.     Administrative Determination Under Review ........................................2

    II.    Statement Of Issues ..............................................................................2

STATEMENT OF FACTS ....................................................................................3

SUMMARY OF ARGUMENT .............................................................................8

ARGUMENT .........................................................................................................9

    I.     Standard Of Review.............................................................................9

    II.    Commerce's Determination Of A Particular Market Situation In Korea Is In Accordance With Law ...................................................12

    III.   Commerce's Determination Of A Particular Market Situation In Korea With Respect To Hot-Rolled Steel Coil Is Supported By Substantial Evidence................18

        A.     Korean Government Subsidies On Hot-Rolled Steel Coil............................19

        B.     Korean Imports Of HRC From China................................20

        C.     Strategic Alliances Between Korean HRC Suppliers And CWP Producers ...21

        D.     Korean Government Control Over The Electricity Market ..........................22

        E.     Plaintiffs' Challenges To Commerce's Determination Lack Merit...............24

    IV.   The TPEA Amendments Permit Commerce To Address Distortions In Reported Costs Through Various Calculation Methodologies, Including Cost Adjustments.....26

    V.    Commerce's Use Of A Regression Model To Adjust For A PMS In Korea Is Lawful ..............................................................................32

        A.     Legal Framework For Calculating Costs Where A PMS Is Found ...............32

        B.     Commerce's Regression Model Is A Reasonable Methodology For Quantifying The Impact Of A PMS In Korea ...............................................33

CONCLUSION.....................................................................................37

i

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Algoma Steel Corp. v. United States,*
   865 F.2d 240 (Fed. Cir. 1989) ....................................................................................24, 26

*Atl. Sugar, Inc. v. U.S.,*
   744 F.2d 1556 (Fed. Cir. 1984) ....................................................................................11

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
   467 U.S. 837 (1984)............................................................................. 11, 12, 29

*Cleo Inc. v. United States,*
   501 F.3d 1291 (Fed. Cir. 2007) ....................................................................................10

*Consolidated Edison Co. v. NLRB,*
   305 U.S. 197 (1938)....................................................................................................10

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966)....................................................................................................10

*Downhole Pipe & Equip., L.P. v. United States,*
   776 F.3d 1369 (Fed. Cir. 2015) ....................................................................................19

*Fujitsu Gen. Ltd. v. United States,*
   88 F.3d 1034 (Fed. Cir. 1996) ..............................................................................passim

*Goldlink Indus. Co. v. United States,*
   431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006)....................................................................10

*Husteel Co., Ltd. v. United States,*
   426 F. Supp. 3d 1376 (Ct. Int'l Trade 2020)............................................................26, 29

*Hyundai Steel Company v. United States,*
   43 CIT , 415 F. Supp. 3d 1293....................................................................................24

*INS v. Elias-Zacarias,*
   502 U.S. 478 (1992)....................................................................................................10

*JBF RAK LLC v. United States,*
   790 F.3d 1358 (Fed. Cir. 2015) ..............................................................................12, 33

*Marsan Gida Sanayi Ve Ticaret A.S. v. United States,*
   No. 09-0483, 2011 WL 546815 (Ct. Int'l Trade Feb. 16, 2011)............................................10

*NEXTEEL Co., Ltd. v. United States,*
  392 F. Supp. 3d 1276 (Ct. Int'l Trade 2019)........................................... 24, 25, 33

*NEXTEEL Co., Ltd. v. United States,*
  355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019).......................................15, 24, 25, 31

*Nippon Steel Corp. v. United States,*
  458 F.3d 1345 (Fed. Cir. 2006) ...................................................................11

*Norfolk & W. Ry. Co. v. American Train Dispatchers' Ass'n,*
  499 U.S. 117 (1991)...................................................................................30

*Saha Thai Steel Pipe Public Co., Ltd. v. United States,*
  422 F. Supp. 3d 1363 (Ct. Int'l Trade 2019).................................................26

*Shandong Huarong Gen. Corp. v. United States,*
  159 F. Supp. 2d 714 (Ct. Int'l Trade 2001).................................................11

*Shandong Rongxin Imp. & Exp. Co. v. United States,*
  203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017)...........................................10, 18

*Timex V.I., Inc. v. United States,*
  157 F.3d 879 (Fed. Cir. 1998) ...................................................................11

*Timken Co. v. United States,*
  354 F.3d 1334 (Fed. Cir. 2004) .............................................................11, 29

*Timken Co. v. United States,*
  699 F. Supp. 300 (Ct. Int'l Trade 1988) ...............................................10, 18

*Torrington Co. v. United States,*
  68 F.3d 1347 (Fed. Cir. 1995) ...............................................................12, 13

*U.S. Steel Grp. v. United States,*
  96 F.3d 1352 (Fed. Cir. 1996) ...................................................................12

*United States v. Eurodif S.A.,*
  555 U.S. 305 (2009)................................................................9, 11, 12, 29

**Statutes**

19 U.S.C. § 1675(a)(2)(A) ...........................................................................12

19 U.S.C. § 1677(15) .............................................................14, 15, 16, 27

19 U.S.C. § 1677b .............................................................................................passim

Pub. L. No. 114-27 § 504 .............................................................................................14

**Regulations**

19 CFR § 351.411 ......................................................................................................26

**Administrative Determinations**

*Certain Hot-Rolled Steel Flat Products From Brazil and the Republic of Korea: Amended
Final Affirmative Countervailing Duty Determinations and Countervailing Duty Orders,*
    81 Fed. Reg. 67,960 (Dep't of Commerce Oct. 3, 2016) ......................................20

*Certain Oil Country Tubular Goods from the Republic of Korea,*
    82 Fed. Reg. 18,105 (Dep't of Commerce Apr. 17, 2017) (final results)...............................32

*Circular Welded Non-Alloy Steel Pipe From the Republic of Korea,*
    83 Fed. Reg. 27,541 (Dep't of Commerce Jun. 13, 2018) (final results) ...............................32

*Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results of
Antidumping Duty Administrative Review,*
    85 Fed. Reg. 77,055 (Dep't of Commerce Nov. 6, 2020) (P.R. 264)........................................ 2

*Circular Welded Non-Alloy Steel Pipe From the Republic of Korea: Preliminary Results of
Antidumping Duty Administrative Review,*
    85 Fed. Reg. 2,719 (Dep't of Commerce Jan. 16, 2020) (P.R. 208) (preliminary results) ........ 4

*Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products From the
Republic of Korea: Final Affirmative Determination,*
    81 Fed. Reg. 53,439 (Dep't of Commerce Aug. 12, 2016) ....................................................20

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
    84 Fed. Reg. 2,159 (Dep't Commerce Feb. 6, 2019) (P.R. 20) (Initiation Notice)................... 3

*Large Diameter Welded Pipe from the Republic of Korea: Final Determination of Sales
at Less Than Fair Value,*
    84 Fed. Reg. 6374 (Dep't of Commerce February 27, 2019) ................................................16

**Legislative Materials**

Statement of Administrative Action accompanying the Uruguay Round Agreements Act,
    H.R. Doc. 103-316, (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 (SAA)..............................14

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE
_____
                                             )
NEXTEEL CO., LTD.,                           )
                                             )
            Plaintiff,                       )
                                             )
HYUNDAI STEEL COMPANY and SEAH STEEL         )
CORPORATION,                                 )
                                             )
            Consolidated Plaintiffs,         )
                                             )          NON-CONFIDENTIAL
      and                                    )
                                             )
HYUNDAI STEEL COMPANY,                       )
                                             )
            Plaintiff-Intervenor,            )
                                             )
      v.                                     )          Consol. Court No. 20-03868
                                             )
UNITED STATES,                               )
                                             )
            Defendant,                       )
                                             )
      and                                    )
                                             )
WHEATLAND TUBE COMPANY and NUCOR             )
TUBULAR PRODUCTS INC.,                       )
                                             )
            Defendant-Intervenors.           )
_____)

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the Court, defendant, the United States, respectfully responds to the motions for judgment on the agency record, filed by plaintiff NEXTEEL Co., Ltd. (NEXTEEL) (ECF No. 37), and consolidated plaintiffs, Hyundai Steel Company (Hyundai)

and SeAH Steel Corporation (SeAH) (ECF Nos. 39 and 36, respectively),[1] which challenge several aspects of the Department of Commerce's final results in the twenty-sixth antidumping duty administrative review of circular welded non-alloy steel pipe (CWP) from the Republic of Korea (Korea). As explained below, the motions should be denied because the final results are supported by substantial evidence and are otherwise in accordance with law.

## STATEMENT PURSUANT TO RULE 56.2

### I.     Administrative Determination Under Review

The administrative determination under review is *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 77,055 (Dep't of Commerce Nov. 6, 2020) (P.R. 264) and accompanying Issues and Decisions Memorandum (Dep't of Commerce Nov. 2, 2020) (Final IDM) (P.R. 247) (collectively, *Final Results*). The period of review covered by the *Final Results* is November 1, 2017, to October 31, 2018.

### II.    Statement Of Issues

1.     Whether Commerce's determination that a cost-based "particular market situation" (PMS) existed in Korea during the period of review is supported by substantial evidence on the record and in accordance with the law.

2.     Whether the use of a PMS adjustment to adjust the cost of hot-rolled coil (HRC) in the context of a below-cost analysis is in accordance with the law.

3.     Whether Commerce's regression methodology to calculate the PMS adjustment is supported by substantial evidence on the record and in accordance with the law.

---

[1] Hyundai's and SeAH's motions for judgment upon the agency record incorporate by reference the arguments made in NEXTEEL's motion.

**STATEMENT OF FACTS**

On February 6, 2019, Commerce initiated the twenty-sixth administrative review of the antidumping duty order on circular welded non-alloy steel pipe (CWP) from the Republic of Korea. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 2,159 (Dep't Commerce Feb. 6, 2019) (P.R. 20) (Initiation Notice). The period of review was November 1, 2017, to October 31, 2018. *Id.* The Initiation Notice covered 25 companies that were Korean producers and/or exporters of the subject merchandise. *Id.* Commerce selected NEXTEEL and Husteel Co., Ltd. (Husteel) as mandatory respondents for individual examination in the 2017-2018 administrative review. *See* Respondent Selection Memorandum (Mar. 25, 2019) (C.R. 3, P.R. 21).

On July 15, 2019, the petitioner and defendant-intervenor, Wheatland Tube Company (Wheatland), submitted an allegation that a particular market situation (PMS) existed in this administrative review with respect to subject CWP, based on the cumulative effect of four factors: (1) Korean subsidies on hot-rolled steel coil (HRC), the primary input for CWP; (2) Korean imports of HRC from China; (3) strategic alliances between Korean HRC suppliers and Korean CWP producers; and (4) Korean government involvement in the Korean electricity market. *See* Particular Market Situation Allegation and Supporting Factual Information - Qualitative Submission (July 15, 2019) (P.R. 80-155) (PMS Allegation – Qualitative) and Particular Market Situation allegation and Supporting Factual Information – Quantitative Submission (July 15, 2019) (C.R. 91-100, P.R. 70-79) (PMS Allegation – Quantitative).

On November 14, 2019, Commerce issued a letter inviting all interested parties to submit factual information and comments regarding Wheatland's PMS allegation. *See* Commerce's Letter, Schedule for Submission of Factual Information Relating to Particular Market Situation

Allegation (Nov. 14, 2019) (P.R. 175). In response on December 2, 2019, Commerce received factual information and comments jointly submitted from NEXTEEL, Hyundai, and Husteel. *See* Particular Market Situation Comments and Rebuttal Factual Information, (Dec. 2, 2019) (C.R. 130, 134-146, P.R. 182-196) (Joint Rebuttal PMS Comments). NEXTEEL separately submitted factual information containing its hot-rolled coil purchase data during the POR. *See* NEXTEEL's PMS Rebuttal Factual Information and Comments (Dec. 2, 2019) (C.R. 131, 133, P.R. 181) (NEXTEEL Rebuttal PMS Comments).

On January 16, 2020, Commerce published the preliminary results of its review. *See Circular Welded Non-Alloy Steel Pipe From the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review; 2017– 2018*, 85 Fed. Reg. 2,719 (Dep't of Commerce Jan. 16, 2020) (P.R. 208) (preliminary results), and accompanying Preliminary Decision Memorandum (Jan. 9, 2020) (P.R 203) (PDM). NEXTEEL received a preliminary rate of 31.64 percent and Husteel received a preliminary rate of 5.11 percent. *See Preliminary Results* at 2,720 (P.R. 208). The preliminary rate assigned to non-individually examined companies was 23.74 percent. *Id*.

In its preliminary results, Commerce found that a particular market situation existed in Korea during the period of review concerning the costs of hot-rolled steel coil as a component of the cost of production of circular welded non-alloy steel pipe. *See* PDM at 11-12 (P.R. 203). Commerce based its PMS finding on the collective impact of four factors: (1) the subsidization of Korean hot-rolled steel products by the Korean government; (2) the distortive pricing of unfairly traded Chinese HRC; (3) strategic alliances between Korean HRC suppliers and Korean CWP producers; and (4) distortive government control over electricity prices in Korea. *Id*. at 11.

In determining the normal value for its comparison to U.S. sales in its preliminary calculation of antidumping duties in this review, Commerce based NEXTEEL's normal value on its home market sales. *Id.* at 14. As a result of Commerce's determination that a PMS existed in Korea during the POR, distorting the costs of production of HRC, Commerce made a PMS adjustment to reported costs, including in its application of the statutorily-required sales-below-cost test under 19 U.S.C. § 1677b(b). *See* Preliminary Analysis Memorandum for Nexteel Co., Ltd. (Jan. 9, 2020) (NEXTEEL Prelim. Analysis Memo) (C.R. 157, P.R. 206) at 4. In the *Preliminary Results*, Commerce determined that sufficient information existed to quantify the impact of the PMS on the material cost of HRC in Korea. PDM at 13 (P.R. 203). Commerce relied upon the ordinary least squares (OLS) regression analysis provided by Wheatland, with certain adjustments to more appropriately quantify the impact of the PMS concerning the distortion in cost of HRC that existed in Korea during the period of review. *Id.* The regression analysis quantifies the impact of global steel excess capacity on the price of HRC at the national level, and derives a corresponding percentage adjustment factor, that when applied to respondents' costs of HTC, accounts for distortions resulting from the PMS in Korea during the period of review. *See* PMS Allegation – Quantitative at 2-3.

Specifically, Commerce found that use of the regression coefficient for uneconomic capacity as the basis for the PMS adjustment is directly related to the principal cause for a cost based PMS in the Korean HRC market. PDM at 13. Uneconomic capacity is defined as the amount of steel capacity in a given year in excess of the largest possible quantity of steel that may be demanded in that year (*i.e.*, global capacity minus the highest global production ever experienced prior to that year). *See* PMS Allegation – Quantitative at 12. Commerce chose not to adopt the adjustment proposed by petitioners, based on calculating a counterfactual HRC

import average unit value dependent upon changes in uneconomic capacity as well as the other independent variables which are not directly related to the alleged cost-based PMS. PDM at 13. To isolate the factors contributing to the cost-based PMS in the Korean HRC market, and to remove bias by holding all other factors constant for global uneconomic capacity in the steel industry on HRC average unit values (AUVs) in Korea, Commerce relied on the regression coefficient associated with uneconomic capacity to quantify the PMS adjustment to the respondents' reported HRC costs. *Id*. at 14. Additionally, Commerce lowered the target capacity utilization rate used in the regression analysis to 80 percent, which Commerce reasonably determined more accurately reflected the historic capacity utilization rate for the preceding ten years. *Id*. (citing PMS Allegation – Qualitative at Exhibit 15, containing Steel Market Developments-Q4 2018, OECD (2019) (P.R. 80-155)).

During the preliminary stage, the regression analysis based on the OLS model where the data for the dependent variable are the import HRC average unit values for 38 countries, including Korea, resulted in an estimated regression coefficient for uneconomic capacity of -0.588 (*i.e.*, a 10 percent decrease in uneconomic capacity will result in a 5.88 percent increase in Korean HRC prices). NEXTEEL Prelim. Analysis Memo (C.R. 157, P.R. 206) at 3. To compute a PMS adjustment factor, this "beta" rate is multiplied by the percent reduction in uneconomic capacity that is required to reduce overall production capacity to the "implied capacity" level. *Id*. The equations, values, and the result for the needed percent reduction in capacity is as follows:

$$\frac{capacity_{2017} - implied\ capacity_{2017}}{capacity_{2017} - production_{max}} = \frac{2251.20 - 2113.10}{2251.20 - 1669.50} = 23.74\%$$

where *implied capacity*$_{2017}$ is as follows:

$$\frac{production_{2017}}{capacity\ utilization\ rate} = 1690.48/0.80 = 2113.10$$

*Id.* The 23.74 percent required reduction in uneconomic capacity, when multiplied by the "beta" for uneconomic capacity (*i.e.*, -0.588) determined as a result of the OLS model on which Commerce relied for its preliminary results, amounts to a 13.96 percent increase in Korean HRC prices. *Id.* Therefore, Commerce preliminarily increased Nexteel's reported costs by 13.96 percent to account for the cost-based PMS that existed in Korea. *Id.* Between February 28 and March 12, 2020, interested parties submitted case and rebuttal briefs addressing issues in the *Preliminary Results*.

On November 6, 2020, Commerce issued the *Final Results*. In the *Final Results*, subject to slight modifications in Commerce's preliminary PMS adjustment calculations,[2] Commerce affirmed its preliminary decision that a PMS existed in relation to the cost of inputs to the production of the subject CWP. Final IDM at 14-17 (P.R. 203). With respect to its affirmative particular market situation finding, Commerce explained that the existence and cumulative impact of the four factors led it to find a single particular market situation that impacts the cost of producing CWP. *Id.* at 17. Specifically, Commerce explained that the record supported the following findings:

(1)      the Korean government significantly subsidizes Korean producers of hot-rolled steel coil, which is the primary input in CWP, thereby distorting Korean market prices for hot-rolled steel coil and the resulting cost of producing CWP;

(2)      the Korean steel market has been flooded with imports of cheaper Chinese steel products as a result of significant overcapacity in Chinese steel production, further placing

---

[2]  In the *Final Results*, Commerce continued to adjust NEXTEEL's HRC cost based on the results of a regression analysis, with the exception of modifying the PMS adjustment rate to only adjust costs related to HRC, after mistakenly adjusting costs for all direct material costs based on the PMS adjustment rate for the *Preliminary Results*. IDM at 3.

distortive downward pressure on domestic steel prices in Korea;

(3)      a set of strategic alliances exists between certain Korean hot-rolled steel coil suppliers and Korean CWP producers that contribute to the existence of a particular market situation in Korea impacting the cost of CWP production, and new evidence on the record of this review points to collusion and price-fixing schemes engaged in by the Korean steel industry, including both mandatory respondents; and

(4)      the Korean government's involvement in the electricity market—in particular, the government's use of the electricity market as a tool of industrial policy and its control of the largest electricity supplier in Korea, KEPCO—contributed to the existence of a particular market situation in Korea impacting the cost of production of CWP. *Id*. at 14-17.

Commerce determined that the collective impact of these "intertwined market conditions" demonstrated that the costs of producing CWP in Korea are distorted and are not in the ordinary course of trade. *Id*. at 17. Thus, Commerce continued to find that a particular market situation existed in the Korean market for the period at issue. *Id*. The final weighted average dumping margins calculated in this review were: 4.92 percent for Husteel, 27.28 percent for NEXTEEL, and 21.01 percent for non-individually examined companies. *See Final Results* at 71,056.

## SUMMARY OF ARGUMENT

Commerce reasonably found that a PMS existed in the Korean hot-rolled steel coil (HRC) market, as an input of welded carbon steel standard pipes and tubes (pipe and tube), based upon the following factors: 1) Korean subsidies on hot-rolled steel coil (HRC), the primary input for CWP; 2) Korean imports of HRC from China; 3) strategic alliances between Korean HRC suppliers and Korean CWP producers; and 4) Korean government involvement in the Korean electricity market.

Additionally, Commerce has the statutory authority to adjust the costs of production of inputs impacted by a PMS for the sales-below-costs test for home market sales. The language, legislative history, and context of the statute as a whole demonstrate that Congress did not intend for Commerce to rely on distorted costs.

Commerce's quantification of the impact of Korea's PMS was reasonable. Commerce utilized an "other calculation methodology" in calculating NEXTEEL's costs of production by adjusting NEXTEEL's reported cost of production to account for distortions in input costs based on a determination of a cost-based PMS. The domestic interested parties provided a regression analysis on Commerce's record called Ordinary Least Squares fixed effects regression (OLS model), with price (*i.e.*, average unit values (AUVs)) as the dependent variable. Commerce determined it would use an OLS model because this model appropriately quantifies the impact of the PMS concerning the distortion in cost of HRC that Commerce found to have existed in Korea during the POR. Commerce accepted the model using data up to and including 2017, which was within Commerce's discretion and based on substantial evidence. Therefore, Commerce's quantification of the distortive effects of the PMS in Korea is supported by substantial evidence and in accordance with law.

## ARGUMENT

## I. Standard Of Review

This Court sustains "'any determination, finding, or conclusion found' by Commerce unless it is 'unsupported by substantial evidence upon the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)); *see also United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). "Substantial evidence" consists of "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing two inconsistent conclusions from evidence upon the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Moreover, this Court affords Commerce "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when Commerce exercises its technical expertise to select and apply methodologies to implement the dictates of the trade statute. *Marsan Gida Sanayi Ve Ticaret A.S. v. United States*, No. 09-0483, 2011 WL 546815, at *6 (Ct. Int'l Trade Feb. 16, 2011) (quoting *Fujitsu*, 88 F.3d at 1039). When Congress has entrusted an agency to administer a statute that demands inherently fact-intensive inquiries, such as in this case, the agency's conclusions may be set aside only if the record evidence is "so compelling that no reasonable factfinder" could reach the same conclusion. *Id.* (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992)); *accord Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017). Likewise, it is improper to overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007), and the Court will not substitute its judgment for that of Commerce in choosing between two fairly conflicting views, even though it could justifiably have made a different choice had the matter been before it *de novo*. *See Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006); *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (Court will not "weigh the adequate quality or quantity of the evidence for sufficiency").

In short, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court will sustain Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from them. *See Atl. Sugar, Inc. v. U.S.*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714, 718 (Ct. Int'l Trade 2001).

When the Court examines Commerce's interpretations of the statute it administers, the Court employs the two-pronged test established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). First, the Court examines "whether Congress has directly spoken to the precise question at issue," and if it has, the agency and Court must comply with the clear intent of Congress. *Id.* at 842-43. The Court in doing so may rely upon the statute's structure and legislative history for guidance. *See Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998). If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. In such cases, "{a}ny reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation and quotation marks omitted), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (citation omitted). The Court "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at

843 n.11. Indeed, "the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *Eurodif*, 555 U.S. at 316.

Finally, this Court affords Commerce an especially great deal of deference "when a statute fails to make clear 'any Congressionally mandated procedure or methodology for assessment of the statutory tests.'" *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (quoting *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996)). In that circumstance, the Court of Appeals for the Federal Circuit has held that "Commerce 'may perform its duties in the way it believes most suitable.'" *Id.* Consequently, Commerce receives "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and apply methodologies to implement the dictates of the trade statute. *Fujitsu*, 88 F.3d at 1039.

## II.   Commerce's Determination Of A Particular Market Situation In Korea Is In Accordance With Law

Given the broad discretion afforded to Commerce in the statutory language and the legislative history regarding "particular market situation," Commerce reasonably determined that it had the legal authority to adjust respondents' cost of production. NEXTEEL's arguments regarding the scope of Commerce's authority to address a PMS should be rejected.

The antidumping duty statute directs Commerce to determine whether subject merchandise is being, or is likely to be, sold at less than fair value in the United States by comparing the U.S. price and the normal value of subject merchandise. 19 U.S.C. § 1675(a)(2)(A). In doing so, the statute further directs that "a fair comparison shall be made between the export price or constructed export price and normal value." 19 U.S.C. § 1677b(a); *see also Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (explaining that

the statutory framework "seek{s} to produce a fair 'apples-to-apples' comparison between foreign market value and United States price").

Generally, export price is defined as the price at which subject merchandise is first sold in the United States, and the normal value represents the price at which the merchandise is sold in the exporting country. *See id.* §§ 1677a(a), 1677b(a)(1). Within this framework, normal value is generally determined by reference to sales of merchandise in the home market, sales of merchandise in a third country, or a constructed value of the merchandise consisting of the cost of manufacturing, selling, general, and administrative expenses, profit, and packing expenses. *See* 19 U.S.C. §§ 1677b(a)(1), (a)(4), (e).

When the record includes home market sales, several considerations affect whether Commerce will rely on these sales in calculating normal value. In particular, under 19 U.S.C. § 1677b(a)(1)(C), Commerce may consider home market sales unusable when "the particular market situation in the exporting {home market} country does not permit a proper comparison with the export price or constructed export price." *Id.* Likewise, section 1677b(a)(1)(B)(ii) provides that Commerce may use sales to a third-country market, but only if Commerce does not determine that a PMS prevents a proper comparison with United States price. 19 U.S.C. § 1677b(a)(1)(B)(ii)(III).

Thus, Commerce has statutory authority to disregard reported prices in either the home market or third-country markets when a "particular market situation" exists in the exporting country or the third country, thereby preventing Commerce from making a proper comparison to U.S. price. *See* 19 U.S.C. § 1677b(a)(1)(C)(iii), (B)(ii)(III). Although the statute does not define "particular market situation," the Statement of Administrative Action provides a non-exhaustive list of examples of what might be considered a PMS. *See* Statement of Administrative Action

13

accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, at 822 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4162 (SAA). For instance, a PMS might exist when the home market consists of a single sale, when there is government control over pricing to such an extent that home market prices cannot be considered to be competitively set, or when the demand patterns in the foreign market are different from those in the United States (*e.g.*, when substantial price changes are closely correlated with holidays occurring at different times of the year in the two markets). *See id.*

Section 504 of the Trade Preferences Extension Act of 2015 (TPEA) amended the Tariff Act of 1930 to provide Commerce with additional discretion by applying the "particular market situation" concept when determining normal value. *See* Pub. L. No. 114-27 § 504, 129 Stat. 362 (2015). Specifically, Congress – in section 504 – added the PMS concept to 19 U.S.C. § 1677(15)'s definition of sales and transactions that Commerce will consider outside the "ordinary course of trade," and thus not usable in its antidumping calculations. Under section 1677(15), Commerce *shall find* "sales and transactions" to be "outside the ordinary course of trade" in situations in which it "determines that the *particular market situation* prevents a proper comparison with the export price or constructed export price." *Id.* (emphasis added).

NEXTEEL contends that the threshold for determining a PMS must necessarily be high, and that Commerce's PMS finding should be invalidated. *See* NEXTEEL Br. at 24-27. In addition, NEXTEEL relies upon the SAA and citations to past Commerce determinations from decades ago that have completely different factual records and were made well before the 2015 TPEA Amendment. *Id.* There are multiple problems with these arguments.

First, while the SAA language was in place before the constructed value particular market situation provision in § 1677b(e) was added through the 2015 TPEA, Commerce interprets both

the sales and cost provisions together.  NEXTEEL argues that Commerce should only interpret the SAA language, ignoring the actual statutory language, *i.e.*, the 2015 TPEA.  *See* NEXTEEL Br. at 24-27.  However, during the floor debates regarding the TPEA, members of Congress expressed concern regarding cost distortions in inputs, including cost distortions that resulted from unfair subsidization or dumping.  For example, Representative Meehan highlighted that the legislation would empower Commerce "to disregard prices or costs of inputs that foreign producers purchase if {Commerce} has reason to believe or *suspect that the inputs in question have been subsidized or dumped*."  161 Cong. Rec. H4666-01, H4690 (daily ed. June 25, 2015) (statement of Rep. Meehan) (emphasis added); *NEXTEEL*, 355 F. Supp. 3d at 1349 (quoting same).  Reviewing the TPEA's legislative history, this Court has recognized that the statute allows for Commerce to consider the alleged factors in a totality of circumstances analysis. *NEXTEEL*, 355 F. Supp. 3d at 1349.

Here, Commerce reasonably determined, based upon consideration of substantial evidence in the record, that a PMS existed in Korea during the period of review due to the collective impact of the four factors detailed above:  Korean HRC subsidies, Korean imports of HRC from China, strategic alliances, and government involvement in the Korean electricity market.  PDM at 12.  The combined effect of these factors resulted in a single PMS that was similar in kind and degree to the unexhaustive language of the SAA as informed by the 2015 TPEA.  *See* SAA at 822; 19 U.S.C. § 1677(15).

Further, NEXTEEL argues that the threshold question for finding a PMS is whether a specific respondent's reported cost does not accurately reflect the cost of production in the ordinary course of trade.  *See* NEXTEEL Br. at 27.  However, the statute states that in "{s}ituations in which the administering authority determines that the particular market situation

prevents a proper comparison with the export price," Commerce "*shall* consider {} sales and transactions, among others, to be outside the ordinary course of trade." 19 U.S.C. § 1677(15) (emphasis added). Consistent with previous determinations, Commerce has stated that input prices (*i.e.*, production costs) do not need to be found to be outside the ordinary course of trade to find the existence of a PMS. *See* Final IDM at 10 (citing *Large Diameter Welded Pipe from the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 6374 (Dep't of Commerce February 27, 2019) (*Large Diameter Welded Pipe from Korea*), and accompanying IDM at Comment 1); 19 U.S.C. § 1677(15). To the contrary, Commerce concluded that finding a PMS exists results in a determination that the relevant input prices are outside of the ordinary course of trade as discussed above under the statute definition for ordinary course of trade. *See* Final IDM at 10.

NEXTEEL's subsequent argument that the passage of time normalized the PMS in Korea and made the distorted costs accurately reflect the costs of production within an ordinary course of trade is also unavailing. *See* NEXTEEL Br. at 28. "Ordinary course of trade" is defined as "the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, *have been normal* . . . with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15). As a matter of grammar and logic, when interpreting this provision, it is clear that conditions must have been "normal" for a reasonable time prior to the exportation. Normalcy and passage of time are two separate requirements; the passage of time alone does not transform a market with significant distortions into a normal market. An example that Commerce gave to illustrate this point was: if the government controls the prices of certain inputs to such an extent that they cannot be considered to be competitively set (such as mandating that all inputs be sold at a particular price), the passage of time alone does not render

such pricing practices consistent with normal market conditions and practices. *See* Final IDM at 10. Rather, it simply means that abnormal conditions have persisted for a period of time. *Id.*

Additionally, NEXTEEL's attempt to shift the Court's focus to NEXTEEL's individual transactions is unavailing. NEXTEEL Br. at 27. In determining whether a PMS exists, the question is not whether a respondent's specific purchase prices of HRC were distorted and, thus, outside the ordinary course of trade; but whether prices reflected in the Korean HRC market as whole are distorted such that they do not accurately reflect the cost of production of CWP in Korea in the ordinary course of trade. *See* Final IDM at 16. As Commerce explained, the purpose of a PMS analysis is to identify whether there are distortions in the market as a whole, and a company-specific analysis is inappropriate in a situation where there is sufficient evidence demonstrating that the market as a whole is distorted, and a PMS exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the COP in the ordinary course of trade. *Id.* If a particular market is distorted as a whole, it would be illogical to conclude that one company operating in that particular market is insulated from the market distortions with respect to cost. *Id.* The cumulative distortions created by the analyzed factors collectively resulted in a PMS in Korea such that the cost of materials, and fabrication or other processing of any kind, did not accurately reflect the cost of production in the ordinary course of trade that necessarily had distortive effects *throughout the entire market. Id.* Accordingly, Commerce reasonably determined that it had the legal authority to adjust respondent's cost of production and none of NEXTEEL's arguments are sufficient to disturb that determination.

**III.    Commerce's Determination Of A Particular Market Situation In Korea With
Respect To Hot-Rolled Steel Coil Is Supported By Substantial Evidence**

As we demonstrated above, the plain language of the statute and the legislative history of
the TPEA amendments demonstrate Commerce's discretion to adjust respondents' costs when it
determined a PMS existed rendering the input's (*i.e.*, hot-rolled steel coil (HRC)'s) cost outside
of the ordinary course of trade.  Commerce's determination was based on the cumulative effect
of: (1) Korean subsidies on HRC; (2) Korean imports of HRC from China; (3) strategic alliances
between Korean suppliers and Korean producers, and; (4) the involvement of the Korean
government in the electricity market. *See* Final IDM at 8.  NEXTEEL challenges various aspects
of Commerce's analysis, but its arguments disregard the applicable standard of review and
improperly request that the Court reweigh the record evidence.  NEXTEEL Br. at 29-38.
Because Commerce reasonably evaluated the record before it in determining that a particular
market situation exists in the Korean HRC market, Commerce's determination should be
sustained. *See Shandong Rongxin Import & Export Co., Ltd. v. United States*, 203 F. Supp. 3d
1327, 1338 (Ct. Int'l Trade 2017) (noting "tremendous amount of deference" afforded
Commerce factual findings) (internal quotation omitted); *Timken Co. v. United States*, 699 F.
Supp. 300, 306 (Ct. Int'l Trade 1988) (explaining that the Court will not "weigh the adequate
quality or quantity of the evidence for sufficiency") (citations omitted).

NEXTEEL argues that Commerce simply relied on previous determinations in prior
reviews or in other cases where it made affirmative PMS findings. *See* NEXTEEL Br. at 29.
Contrary to the plaintiffs' arguments, Commerce reasonably evaluated the record and period of
review in determining that a particular market situation exists in Korea. *See* Final IDM at 14.
Commerce explained that the factors identified above are present and that the cumulative impact
of those factors results in finding that a particular market situation exists in Korea which distorts

the cost of production of CWP.  *Id.*  The Court should not reweigh the evidence.  *See Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015) (the Court's role is not to "reweigh the evidence … or to consider questions of fact anew.").  That Commerce's determination is consistent with past PMS determinations is unsurprising  given that the agency is reviewing the HRC market in the same country with consistent distorting factors, but that does not indicate that Commerce did consider and evaluate the record evidence for this administrative review.  *See* Final IDM at 14.  Accordingly,  the Court should sustain Commerce's determination.

### A.  Korean Government Subsidies On Hot-Rolled Steel Coil

Commerce found that the Korean government subsidized  the biggest HRC producers in Korea.  *See* Final IDM at 15.  Although the level of subsidization  has decreased in recent years, the Government of Korea (GOK) continued to subsidize  its steel industry at above *de minimis* levels.  *Id.*  Commerce reasonably determined that the Korean government's subsidization of Korean steel producers exerted downward pressure on HRC prices in Korea, distorting transactions involving  consumers of HRC (*e.g.*, producers of CWP).  *Id.*  Commerce reasonably concluded that the Korean HRC producers must adjust their pricing in response to the price suppression  that would result from assistance to Korean HRC producers.  *Id.*  These resultant distortions  of HRC input costs flow directly to the COP of CWP.  *Id.*

NEXTEEL wishes for this Court to reweigh the evidence Commerce relied upon when determining  the existence of Korean government intervention.   *See* NEXTEEL Br. at 36-38. NEXTEEL's disagreement with Commerce's conclusion does nothing to negate the record evidence upon which Commerce relied.  One factor that Commerce considered in reaching this conclusion  was that in *Hot-Rolled Steel Flat Products from Korea*, Commerce found that the Korean government heavily subsidizes  hot-rolled  steel producers in Korea, and the agency

calculated a rate of 57.04 percent for POSCO, a large Korean steel producer (a rate that was later amended to 58.68 percent). Final IDM at 14 (citing *Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Affirmative Determination*, 81 Fed. Reg. 53,439 (Dep't of Commerce Aug. 12, 2016) and accompanying Issues and Decision Memorandum ("HR Korea Final IDM"); *Certain Hot-Rolled Steel Flat Products From Brazil and the Republic of Korea: Amended Final Affirmative Countervailing Duty Determinations and Countervailing Duty Orders*, 81 Fed. Reg. 67,960 (Dep't of Commerce Oct. 3, 2016)). Petitioners also provided various articles new to this review, such as one detailing how the Korean government has subsidized the Korean steel industry by propping up the struggling Korean shipbuilding industry. *See, e.g.*, PMS Allegation – Quantitative at Exhibit 2 (Costas Paris, *South Korea Hands Another $5 Billion to Hyundai Merchant Marine*, Wall St. Journal (Oct. 10, 2018). Given this record evidence, Commerce reasonably concluded that evidence of government subsidization of HRC as well as evidence of Korean government subsidies in the Korean steel market was sufficient to show the Korean government provides financial and institutional support to domestic steel producers. Final IDM at 14. The Court should decline NEXTEEL's offer to reweigh the record evidence.

**B.    Korean Imports Of HRC From China**

Commerce relied on substantial record evidence to determine that pervasive low-priced imports from China into the Korean market contributed to a particular market situation in Korea. Commerce explained that the significant overcapacity in Chinese steel production, which stems in part from the distortions and interventions prevalent in the Chinese economy, resulted in the Korean steel market being flooded with imports of cheaper Chinese steel products. *See* Final IDM at 14 (citing Particular Market Situation Allegation at Exhibit 15). This, in turn, placed

downward pressure on Korean domestic steel prices, which combined with the heavy

subsidization by the Korean government of domestic steel production, distorts the Korean market

prices of hot-rolled steel coil as reasonably determined by Commerce based on record evidence.

*Id.* at 14-15 (citing Particular Market Situation Allegation at Exhibits 2, 3, 5).

Additionally, Commerce agreed with the respondents that the record reflected that some

steel manufacturers in Korea realized a profit over the period of review. Final IDM at 13. The

prices of imported steel into Korea increased overall, and, as NEXTEEL claims, there was a

decline in Chinese steel imports. S*ee* NEXTEEL Br. at 33. Yet, Commerce determined that the

volume of Chinese steel products continued to be imported into Korea at significant enough

levels that the prices of these imports had a distorting effect on the domestic price of HRC in the

Korean market and in turn distorted the costs of Korean CWP production.   *See* Final IDM at 14

(citing Particular Market Situation Allegation at Exhibit 15).  Furthermore, Commerce found that

the record did not indicate that Chinese imported steel prices increased to such an extent to

relieve the market distortions or price suppression caused by Chinese overcapacity during the

period of review.  *See* Final IDM at 15; PDM at 13.  In other words, even though there was

decline in the amount of Chinese steel imports and an increase of the price of those imports, the

amount and price of imported Chinese steel still had a distorting effect on the domestic Korean

price of HRC.  *Id.*

### C.  <u>Strategic Alliances Between Korean HRC Suppliers And CWP Producers</u>

Record evidence further demonstrated the existence of strategic alliances between certain

Korean hot-rolled steel coil suppliers and Korean CWP producers that may have ultimately

affected the prices of hot-rolled steel coil in Korea.  *Id.* at 12 (citing Particular Market Allegation

at Exhibits 7 and 8).  Specifically, Commerce found that information on the record of this review

included evidence of collusion and price-fixing schemes engaged in by the Korean steel industry, including Husteel, Hyundai, and SeAH. *See* Particular Market Situation Allegation Exhibit 7 (containing Notice from Korean Fair Trade Commission (KFTC), "KFTC punishes six steel pipe manufacturers for rigging bids offered by Korea Gas Corporation," dated December 21, 2017); and Exhibit 8 (containing Korea Times Article, "Steelmakers fined W92 bil. for bid rigging," by Park Jae-hyuk, dated December 20, 2017); *also see* Exhibit 9 (containing Korean Fair Trade Commission Decision Nos. 2017-081, 98-134, and 97-45 regarding various price-fixing schemes and improper collusion engaged in by certain Korean pipe producers, including Husteel, Hyundai, and SeAH). The respondents' participation in such anticompetitive arrangements in the past is a relevant consideration when evaluating the totality of circumstances. Commerce reasonably found that even though the record did not contain specific evidence showing that strategic alliances *directly* created a distortion in hot-rolled steel coil pricing, the record evidence of strategic alliances and price fixing schemes between certain Korean hot-rolled steel coil suppliers and Korean CWP producers is relevant as an element of Commerce's particular market situation. *See* Final IDM at 15. Specifically, Commerce found the strategic alliances and price fixing schemes may have created distortions in the prices of hot-rolled steel coil in the past and may continue to impact pricing in a distortive manner during the period of review and in the future. *Id*. Given that record evidence supports the determination that these strategic alliances and price fixing schemes may have caused distortions, Commerce reasonably included it as a factor in its PMS determination.

   D.   <u>**Korean Government Control Over The Electricity Market**</u>

   With respect to the fourth factor concerning distortion in the Korean electricity market, Commerce reasonably found that the price of electricity is set by the Korean government and

that it functions as a tool of the government's industrial policy.  Final IDM at 15-16.  Commerce

determined that the Korean government has tight control over the electricity market, including

supply and pricing.  *Id.* at 16 (citing Particular Market Situation Allegation at Exhibits 10-14).

Additionally, Commerce found that Korea's largest electricity supplier, KEPCO, is a

government-controlled entity, and is responsible for the transmission, distribution, and sale of

electricity to customers.  *Id.*  These findings are consistent with the SAA's guidance that a

particular market situation may exist when there is government control over prices to such an

extent that home market prices cannot be considered to be competitively set.  *Id.* (citing SAA at

822).  Based upon recent determinations that the Korean government has not provided electricity

for less than adequate remuneration, NEXTEEL contends that there is no basis for finding a

PMS.  *See* NEXTEEL Br. at 35.  However, the record evidence showing significant government

control in the electricity market and resulting distortions caused by price fixing across the market

as a whole are the basis for Commerce's PMS finding with respect to this factor.  *See* Final IDM

at 16; NEXTEEL Br. at 35.  Accordingly, Commerce reasonably found that this factor

contributes to a particular market situation because the distortion of Korea's electricity market

places downward pressure on the pricing of electricity.  Combined with the other three factors,

Commerce's determination that a particular market situation exists in Korea is supported by

substantial record evidence.

Finally, we reiterate that Commerce's particular market situation determination in this

case was based on consideration of the collective effect of the factors described above.  *See* Final

IDM at 17.  Commerce found that the intertwined market conditions signify that the production

costs of CWP, especially the acquisition prices of hot-rolled steel coil in Korea, are distorted and,

thus, demonstrate that the costs of hot-rolled steel coil to Korean CWP producers are not

established in the ordinary course of trade. *Id.* Commerce undertook a cumulative analysis based on the totality of the circumstances and record evidence pertaining to each of the factors described above, and based on its evaluation of the record, reasonably concluded that a particular market situation exists in Korea during the period of review for the instant administrative review. *Id.* at 14.

### E.  Plaintiffs' Challenges To Commerce's Determination Lack Merit

None of the arguments challenging Commerce's fact-finding demonstrate that Commerce's determination is unsupported by substantial evidence or otherwise unlawful.

NEXTEEL argues that this case is essentially the same as the determinations at issue in *NEXTEEL I*, *NEXTEEL II,* and *Hyundai Steel I* and suggests that reversal is required because of the Court's decisions in those cases. *See* NEXTEEL Br. at 7-8 (citing *NEXTEEL Co., Ltd. v. United States*, 355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) (*NEXTEEL I*); *NEXTEEL Co., Ltd. v. United States*, 392 F. Supp. 3d 1276 (Ct. Int'l Trade 2019) (*NEXTEEL II*)); *Hyundai Steel Company v. United States*, 43 CIT , 415 F. Supp. 3d 1293 (*Hyundai Steel I*).  There are several flaws in this position.  As an initial matter, each Commerce proceeding stands on its own and is a separate case before this Court.  *See*, *e.g.*, *Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1342 n.13 (Ct. Int'l Trade 2018).  Additionally, those and other rulings by this Court are not binding on the Court in the present case.  *See Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989).  These considerations are all the more relevant when, as here, in one of those prior cases the Government did not argue the merits before the Court because it had requested voluntary remand following Commerce's change in position between the preliminary and final results.  *See NEXTEEL I*, 355 F. Supp. 3d at 1347-48.  Thus, this Court in *NEXTEEL I*

did not issue a decision on a particular market situation determination where the Government has advanced merits arguments in Commerce's defense. *See id.*

Moreover, *NEXTEEL I* was determined, at least in part, by the Court's concerns as to factors that are not present in this case. Specifically, the Court reasoned as follows:

> The {C}ourt finds it unreasonable that Commerce reversed its position {from the preliminary results} and subsequently found a particular market situation based on the same evidence. It does not stand to reason that individually, the facts would not support a particular market situation, but when viewed as a whole, these same facts could support the opposite conclusion. The {C}ourt concludes that Commerce's determination of the existence of one particular market situation in Korea is unsupported by substantial evidence.

*NEXTEEL I*, 355 F. Supp. 3d at 1351. Those circumstances are not at issue here. Commerce made an affirmative particular market situation determination in its preliminary results and maintained that determination in the final results. Hence, notwithstanding that Commerce compared the record here to that of *NEXTEEL I*, this is a fundamentally difference case.

The plaintiffs' reliance on the Court's decision in *NEXTEEL II* is similarly flawed. In *NEXTEEL II*, the Court stated that because it found that Commerce's original particular market situation determination in *NEXTEEL I* was not supported by substantial evidence, the Court found it difficult to find that Commerce's determination in the subsequent review was supported by substantial evidence because it was based on substantially the same facts and record evidence. *NEXTEEL II*, 392 F. Supp. 3d at 1288. The Court stated that Commerce did not rely on additional evidence when making its ultimate determination. *Id.* The Court's decisions in *NEXTEEL II* as well as *Hyundai Steel I* are distinguishable. As discussed in the preceding section, the record in this case contains updated evidence relevant to the relevant period of review that Commerce considered in making its finding that a particular market situation exists

in Korea.  *See* Final IDM at 14-17.  Thus, this case presents a separate body of record evidence

that was critically evaluated by Commerce and should not be rejected based on past decisions.

## IV.    The TPEA Amendments Permit Commerce To Address Distortions In Reported Costs Through Various Calculation Methodologies, Including Cost Adjustments

The plain language of the statute and the legislative history of the TPEA amendments

demonstrate that Commerce possesses the discretion to adjust NEXTEEL's HRC input purchase

prices for calculating cost of production as part of Commerce's sales-below-costs test, as well as

for other purposes where cost of production is implicated such as Commerce's DIFMER 20

percent test.[3]  They also establish that Commerce has discretion when a selecting a calculation

methodology to address distortions in a particular market.

NEXTEEL points to recent decisions where this Court has held that the Section 504

TPEA amendments did not have any effect on Commerce's discretion in making cost

adjustments under 19 U.S.C. § 1677b(b)(3).  *See, e.g.*, *Husteel Co., Ltd. v. United States*, 426 F.

Supp. 3d 1376 (Ct. Int'l Trade 2020); *Saha Thai Steel Pipe Public Co., Ltd. v. United States*, 422

F. Supp. 3d 1363 (Ct. Int'l Trade 2019); NEXTEEL Br. 12-15.  Respectfully, *Husteel* is

presently on appeal to the Federal Circuit and *Saha Thai* is not final and remains subject to

appeal.  Additionally, those and other rulings by this Court are not binding on the Court in the

present case.  *See Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989).

---

[3] In comparing U.S. sales with foreign market sales, Commerce may determine that the merchandise sold in the United States does not have the same physical characteristics as the merchandise sold in the foreign market, and thus there is a difference in merchandise (DIFMER) price effect, which Commerce may make a reasonable allowance for when calculating normal value.  19 CFR 351.411(a), (b).  The DIFMER 20 Percent Test states when the variable cost of production difference exceeds 20%, Commerce considers that the probable differences in values of the items to be compared is so large that they cannot reasonably be compared even with an allowance under 19 CFR 351.411.  *See* Policy Bulletin 92-2 (available at https://enforcement.trade.gov/policy/bull92-2.txt).

The statute, in its basic definition of normal value (not just constructed value), requires that normal value reflect a price that is in the "ordinary course of trade." *Id.* § 1677b(a)(1)(B)(i). This carries through to the subsection (b) normal value provisions concerning sales below cost (subsection (b)(3) uses the similar term "ordinary course of business"). *Id.* § 1677b(b)(1), (3). The TPEA generally expanded the meaning of "ordinary course of trade" to include any situation in which Commerce finds that a particular market situation prevents a proper comparison between markets. *See* 19 U.S.C. § 1677(15)(C) (Commerce "shall consider" such transactions outside ordinary course of trade). It also authorizes Commerce to use "any" alternative cost calculation methodology if it determines that a "particular market situation exists such that the cost of materials . . . does not accurately reflect the cost of production in the ordinary course of trade." *See* 19 U.S.C. § 1677b(e). Although the TPEA did not specifically amend § 1677b(b)'s provisions governing Commerce's sales-below-cost test, its expansion of the definition of the term "ordinary course of trade" and the continued inclusion of that term under § 1677b(b) indicate that Commerce was within its broad discretion to interpret § 1677b(b) in line with this TPEA amendment.

The definition of "ordinary course of trade" is directly applicable when Commerce determines normal value. *See* 19 U.S.C. § 1677b(a)(1)(B)(i). Similarly, 19 U.S.C. § 1677b(e) addresses constructed value and provides Commerce with broad authority to use "any other calculation methodology" if costs are distorted by a particular market situation. *Id.* Although 19 U.S.C. § 1677b(e) is the subsection that is applicable to constructed value, given the applicability of the definition "ordinary course of trade" when Commerce determines normal value, 19 U.S.C. § 1677b(a)(1)(B)(i), having Commerce forgo considering costs distorted by a particular market

situation for constructed value, but still consider and rely on those distorted costs for purposes of cost of production and the sales-below-cost test creates an illogical discordance.

Furthermore, 19 U.S.C. § 1677b(e)(1) states: "{f}or purposes of this subtitle, the constructed value of imported merchandise shall be an amount equal to the sum of – *(1) the cost of materials and fabrication or other processing of any kind employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of trade*." (emphasis added). This is later followed by: "{f}or purposes of paragraph (1), if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this part or any other calculation methodology." This language is important because the part of Section 1677b(b) that prescribes how Commerce shall calculate cost of production for the sales-below cost test states: "the cost of production shall be an amount equal to the sum of — (A) *the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business*." 19 U.S.C. § 1677b(b)(3)(A) (emphasis added). The language used in §§ 1677b(e)(1) and 1677b(b)(3)(A) incorporating the concept of ordinary course of trade/business is almost identical for the purposes of calculating cost of production in the constructed value context and for purposes of the sales-below-cost test context respectively. Therefore, because there is nothing expressly prohibiting this interpretation, it is reasonable for Commerce both to interpret section 1677b(e)(1) to allow for a PMS adjustment to costs and to apply that same interpretation to nearly identical language in section 1677b(b)(3)(A).

A key issue before the Court is whether the adjustments Commerce uses in calculating constructed value are prohibited in the home market and third country sales contexts. As both a matter of statutory interpretation, and logic, they are not. Under longstanding precedent beginning with *Chevron*, agencies have been afforded discretion to interpret statutes that are silent on a particular issue. Namely, when a statutory scheme is complex as is the case here, the courts have recognized that it is the agency administering the statute that is best positioned to interpret the statute. In reviewing an agency construction of statutory authority, "{a}ny reasonable construction of the statute is a permissible construction," *Timken*, 354 F.3d at 1342, and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *Eurodif S.A.*, 555 U.S. at 316. The Court "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n.11. Indeed, "the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *Eurodif*, 555 U.S. at 316.

However, in *Husteel*, this court rejected Commerce's interpretation of the statute, concluding that it is not ambiguous and thus requires no analysis under *Chevron*. *Husteel*, 426 F. Supp. 3d at 1383 n.6. Critically, nothing in the statute prohibits Commerce from making these adjustments in the context of costs. The Court in *Husteel* reasoned that "Congress clearly set forth the means by which Commerce is to calculate COP for purposes of the below cost sales test. Congress has spoken to the precise issue . . . ." *Id.* at 1383 n.6. However, in calculating costs, the statute authorizes Commerce to disregard sales and explains the steps Commerce must take once those sales have been disregarded. 19 U.S.C. § 1677b(b). It does not prevent

Commerce from adjusting them in lieu of disregarding them, or even after disregarding some of them.

This Court should consider the totality of the statute in light of the TPEA amendments that expanded the fundamental and ubiquitous term "ordinary course of trade" to include PMS considerations. *See, e.g.*, *Norfolk & W. Ry. Co. v. American Train Dispatchers' Ass'n*, 499 U.S. 117, 129 (1991) (declining to resort to a canon of construction that supported a particular interpretation of a statute when the "whole context," "dictate{s} a different conclusion").

Specifically, with respect to NEXTEEL's arguments that Commerce's PMS adjustment to costs within the context of the DIFMER 20 percent test was unlawful, *see* NEXTEEL Br. at 20-21, Commerce did address this argument in its *Final Results* when it stated, "where a PMS affects the COP of the foreign like product because it distorts the cost of inputs, it is reasonable to conclude that such a situation may prevent a proper comparison of the EP with normal value based on home market prices just as it would when normal value is based on CV." Final IDM at 8-9. That is to say, in instances where cost of production may be distorted by a PMS, Commerce has the discretion to make a PMS adjustment to achieve a fairer comparison. As stated in the relevant Policy Bulletin establishing the practice, Commerce has determined that commercial value for the purposes of the DIFMER 20 percent test can be reasonably determined by cost of production. *See* Policy Bulletin 92-2. It does not state the limitations on adjustments that Commerce may carry out to achieve a more representative cost value to remedy possible distortions, such as those caused by a PMS.

Commerce's interpretation that the TPEA permits it to adjust respondents' costs based upon the particular market situation in Korea is also supported by the relevant legislative history, which states that the amendments ultimately enacted in the TPEA "provide that where a

particular market situation exists that distorts pricing or cost in a foreign producer's home market, {Commerce} has flexibility in calculating a duty that is not based on distorted pricing or costs." S. Rep. No. 114–45, at 37 (2015); *see NEXTEEL Co. v. United States*, 355 F. Supp. 3d 1336, 1349 (Ct. Int'l Trade 2019) (quoting same). This is consistent with the "tremendous deference" that Commerce receives, which is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and apply methodologies to implement the dictates of the trade statute. *See Fujitsu*, 88 F.3d at 1039.

During the floor debates regarding the TPEA, members of Congress expressed concern regarding cost distortions in inputs, including cost distortions that resulted from unfair subsidization or dumping. For example, as stated previously, Representative Meehan highlighted that the legislation would empower Commerce "to disregard prices or costs of inputs that foreign producers purchase if {Commerce} has reason to believe or *suspect that the inputs in question have been subsidized or dumped*." 161 Cong. Rec. H4666-01, H4690 (daily ed. June 25, 2015) (statement of Rep. Meehan) (emphasis added); *NEXTEEL*, 355 F. Supp. 3d at 1349 (quoting same). Reviewing the TPEA's legislative history, this Court has recognized that the statute reflects Congress's "desire to give Commerce the ability to choose the appropriate methodology when a particular market situation exists." *NEXTEEL*, 355 F. Supp. 3d at 1349. The TPEA amendments and their legislative history reflect Congress's intent to expand Commerce's discretion in administering the statute when a particular market situation exists, which includes making cost adjustments to normal value when a foreign producer's home market is distorted by the particular conditions in that market. Therefore, Commerce "has the ability to choose the appropriate methodology so long as it comports with its statutory mandate and

provides a reasoned explanation." *Id.* (citing, among other things, *Fujitsu*, 88 F.3d at 1039 (discussing tremendous methodological deference afforded Commerce)).

Based on statutory language and further evidence of legislative intent, Commerce has found consistently that Section 504 of the TPEA added the concept of a particular market situation in the definition of the term "ordinary course of trade," for purposes of constructed value, "and through these provisions for purposes of the cost of production under {19 U.S.C. § 1677b(b)(3)}." *See, e.g., Certain Oil Country Tubular Goods from the Republic of Korea*, 82 Fed. Reg. 18,105 (Dep't of Commerce Apr. 17, 2017) (final results) and accompanying IDM at cmt. 3; *Circular Welded Non-Alloy Steel Pipe From the Republic of Korea*, 83 Fed. Reg. 27,541 (Dep't of Commerce Jun. 13, 2018) (final results) and accompanying IDM at cmt. 1.

Given the broad discretion afforded to Commerce in the statutory language and the legislative history regarding "particular market situation," Commerce's adjustment of the respondents' cost of production is a reasonable interpretation of the statute and is in accordance with law.

## V.   Commerce's Use Of A Regression Model To Adjust For A PMS In Korea Is Lawful

The regression analysis Commerce used to quantify the impact of the particular market situation in Korea is supported by substantial evidence and in accordance with law. Contrary to plaintiff's, and by incorporation consolidated plaintiffs', assertion that the regression analysis is arbitrary, the regression analysis is supported by economic theory and record evidence.

### A.   Legal Framework For Calculating Costs Where A PMS Is Found

As discussed above, Congress in section 504 of the TPEA amended the statute's constructed value provision, 19 U.S.C. § 1677b(e), permitting Commerce to use alternative cost

calculation methodologies based on PMS findings. The statute does not require that Commerce follow a particular methodology in accounting for distortions that result from a PMS. *Id.* Rather, under section 1677b(e), when Commerce finds that a "particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade," Commerce "may use another calculation methodology under this part *or any other calculation methodology.*" *Id.* (emphasis added).[4]

Accordingly, the statute provides Commerce with broad discretion to address situations in which "the cost of material and fabrication or other processing of any kind" is distorted as a result of a PMS and choose an alternative calculation methodology, as long as it is reasonable. *See JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015). Indeed, Commerce "has the ability to choose the appropriate methodology so long as it comports with its statutory mandate and provides a reasoned explanation." *NEXTEEL Co., Ltd. v. United States*, 392 F. Supp.3d 1276, 1287 (Ct. Int'l Trade 2019) (citing, among others, *Fujitsu*, 88 F.3d at 1039 (discussing tremendous methodological deference afforded Commerce)).

### B. Commerce's Regression Model Is A Reasonable Methodology For Quantifying The Impact Of A PMS In Korea

Commerce utilized an "other calculation methodology" in calculating NEXTEEL's costs of production by adjusting NEXTEEL's reported cost of production to account for distortions in input costs based on a determination of a cost-based PMS. *See Final IDM at 20-21; see also 19*

---

[4] Previously, when Commerce found a PMS affecting home market *sale prices*, the remedy was to disregard all sales in the market. *See* 19 U.S.C. § 1677b(a)(1)(C)(iii). In contrast, the TPEA amendments permit Commerce to address distortions in reported *costs* through various calculation methodologies, including cost adjustments. *See id.* § 1677b(e).

U.S.C. § 1677b(e) (providing that Commerce has the discretion to "use another calculation methodology under this subtitle or any other calculation methodology" to calculate cost of production in the ordinary cost of trade). Commerce quantified this distortion through a PMS adjustment factor derived from a regression analysis proposed by domestic interested parties that, when applied to NEXTEEL's costs of HRC, accounted for distortions introduced by the observed PMS. PDM at 21; *see also* IDM at 63, 65-66. The distortions manifest differently within a given country's market, and the manner in which a national government, here the Korean government, and its steel industry act in the face of that crisis further differentiates the impact at the national level. *See* PMS Allegation – Quantitative at 4. Critical changes in trade patterns, combined with domestic policies and existing market forces, created a singular PMS in Korea driven by the overcapacity crisis. *Id*. The factors that define the current PMS in Korea are unique to Korea and linked by the distortive effects of the Chinese-led overcapacity crisis on the Korean market and the Government of Korea's actions in the face of that crisis. *Id*.

The domestic interested parties provided a regression analysis on Commerce's record called Ordinary Least Squares fixed effects regression (OLS model), with price (*i.e.*, average unit values (AUVs)) as the dependent variable. *See* Particular Market Situation Allegation – Quantitative at 5-7. Commerce determined it would use an OLS model because this model appropriately quantifies the impact of the PMS concerning the distortion in cost of HRC that Commerce found to have existed in Korea during the POR; however, to isolate the factors contributing to the cost-based PMS in the Korean HRC market, and to capture the *ceteris paribus* effect (*i.e.*, holding all other factors constant) for global uneconomic capacity in the steel industry on HRC AUVs in Korea, Commerce relied on the dependent variable (regression

coefficient) associated with uneconomic capacity to quantify the PMS adjustment to the respondents' reported HRC costs.[5] *See* PDM at 13-14.

NEXTEEL asserts that because regression modeling is premised on an assumption of global uneconomic steel capacity, which impacts the global market and is not unique to Korea, using such an analysis is unsuitable for determining the level of suppression in HRC prices in a specific country like Korea. *See* NEXTEEL Br. at 40-41. This argument is not persuasive because the global overcapacity crisis manifests its distortive effects differently in different markets depending on how a given country reacts to the crisis. Although global overcapacity may create distortions across countries, each manifestation of those distortions will be unique to that country.

NEXTEEL further argues that Commerce improperly considered data from 2017 and ignored data from 2018 for purposes of the regression analysis. *See* NEXTEEL Br. at 41-43. As Commerce explained, the updated production figures for 2017 were published in the 2019 World Steel in Figures Report in June 2019, before the PMS allegation by the petitioners was filed in July 2019. *See* Final IDM at 21. But, Commerce did not rely on the 2019 World Steel in Figures Report because the publication explicitly states its production figures for several countries are estimates, which would result in a less representative and accurate result. *Id.* The updated global steel capacity figures for 2017 were published by the Organisation for Economic Co-operation and Development (OECD) in its "Capacity Developments in the World Steel Industry" reported in July 2019 (without a specific publishing date), the same month the allegation was filed. *Id.* Therefore, while production totals from another source were available

---

[5] Indeed, neither NEXTEEL nor any other respondents or interested parties provided a proposed alternative regression model. *Id.*

to the petitioner at the time the allegation was filed, Commerce determined that capacity totals were not yet available. *Id.* Therefore, Commerce found that the petitioner's regression analysis was based on the most recent annual data available for submission during the period of review and was based on consistent time periods and data sources for each time-variant variable. *Id.*

With respect to the 2018 data, as Commerce explained, the data in question covered eight months of the period of review. *Id.* However, Commerce reasonably concluded that using data from all of 2018 would reflect costs associated with production subsequent to the review period, and that much of the production in the first half of 2018 would likely relate to sales occurring outside the period of review. *Id.* Because the POR ended on October 31, 2018, the 2018 data that NEXTEEL argued should have been considered included information that is subsequent to the POR and did not reflect the cost of goods sold during that timeframe. *Id.* Therefore, Commerce accepted the model using data up to and including 2017, which was within its discretion.

NEXTEEL also argues that the 2008-2009 period of data should not be considered as it overlapped with the effects of the global recession. *See* NEXTEEL Br. at 43. However, Commerce provided the reasoned explanation that a period of ten years allows for an adequate amount of data and ensures consistency of the regression analysis from one proceeding to another. *See* Final IDM at 21. Furthermore, Commerce determined that the financial crisis of 2008-2009 was a main event in its analysis because the subsequent decline in global steel demand resulting from the crisis instigated the Chinese stimulus and increased Chinese government investment and spending to boost the steel industry. *Id.* Therefore, in addition to the fact that the financial crisis falls within the ten-year period preceding and including the period of review, Commerce reasonably determined that data from 2008-2009 should be

included in the regression because they account for the volatile period and price fluctuations in the defining years of the global overcapacity crisis that still affect steel import prices today. *Id.*

Lastly, NEXTEEL argued that the data contained in Commerce's analysis lacked adequately product-specific data because it was based on the regression model that contained hot-rolled steel average unit value data based on the 4-digit level Harmonized Tariff Schedule (HTS) category. *See* NEXTEEL Br. at 44. Although a regression model based on more detailed six-digit level HTS data would have arguably been more accurate, Commerce explained that the record did not contain sufficient information to achieve this, and, more importantly, that the respondents, including NEXTEEL, did not provide an alternative regression model for Commerce to consider. *See* PDM at 14.

In sum, Commerce lawfully relied upon a regression model to quantify a PMS adjustment based upon the permissive "any other calculation methodology" statutory language under 19 U.S.C. § 1677b(e) and reasonably explained why the data Commerce considered was appropriate for this purpose.

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiffs' motion for judgment on the agency record and sustain Commerce's final results.

Respectfully Submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:                                    /s/ Robert R. Kiepura
JONZACHARY FORBES                              ROBERT R. KIEPURA
U.S. Department of Commerce                    Trial Attorney
Office of Chief Counsel for                    U.S. Department of Justice
Trade Enforcement and Compliance               Civil Division
1401 Constitution Avenue, NW.                  Commercial Litigation Branch
Washington, DC 20230-0001                      P.O. Box 480, Ben Franklin Station
Telephone: (240) 449-5906                      Washington, DC 20044
Facsimile: (202) 482-8184                      Telephone: (202) 305-4436
Email: JonZachary.Forbes@trade.gov             Fax:      (202) 353-0461
                                               Email:      Robert.Kiepura@usdoj.gov


June 1, 2021                                   *Attorneys for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the word limitation of Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains approximately 11,045 words, excluding the parts of the brief exempted from the word limitation.   In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.


<u>/s/ Robert R. Kiepura</u>