## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES

| | |
|---|---|
| NEXTEEL CO., LTD., | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| HYUNDAI STEEL COMPANY, and SEAH STEEL CORPORATION, | ) |
| | ) |
| *Consolidated Plaintiffs,* | ) |
| | ) |
| and | ) |
| | ) |
| HYUNDAI STEEL COMPANY, | ) |
| | ) |
| *Plaintiff-Intervenor,* | ) |
| v. | ) **Consol. Court No. 20-03868** |
| | ) |
| UNITED STATES, | ) |
| | ) |
| *Defendant,* | ) |
| | ) |
| and | ) |
| | ) |
| WHEATLAND TUBE COMPANY and NUCOR TUBULAR PRODUCTS INC., | ) |
| | ) |
| *Defendant-Intervenors.* | ) |

## REPLY BRIEF IN SUPPORT OF PLAINTIFF NEXTEEL CO., LTD.'S RULE 56. 2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C.  20001
Phone: (202) 942-5000
Fax: (202) 942-5999

J. David Park
Henry D. Almond
Daniel R. Wilson
Leslie C. Bailey
Kang Woo Lee

*Counsel to NEXTEEL Co., Ltd.*
*Plaintiff*

Dated:  July 1, 2021

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  ARGUMENT .................................................................................................... 4

   A.  CONSISTENT WITH THE STATUTE AND COURT PRECEDENT, COMMERCE
       CANNOT APPLY PMS TO COSTS FOR PURPOSES OF THE SALES-BELOW-COST
       TEST ........................................................................................................ 4

      1.  Defendant's and Defendant-Intervenors' Statutory Interpretation is Directly
          Inconsistent with Significant CIT Case Law and Basic Principles of Statutory
          Interpretation ........................................................................................ 5

      2.  Defendant Has Not Demonstrated that the PMS Analysis is In Accordance with Law .. 8

   B.  DEFENDANT'S AND DEFENDANT-INTERVENORS' ARGUMENTS ON
       COMMERCE'S PMS DETERMINATION ARE FLAWED ON THE RECORD OF
       THIS CASE .............................................................................................. 13

      1.  Subsidization ....................................................................................... 15

      2.  Korean Imports of HRC from China ......................................................... 16

      3.  Strategic Alliance ................................................................................. 16

      4.  Electricity ........................................................................................... 18

   C.  COMMERCE'S USE OF A REGRESSION MODEL TO ADJUST FOR PMS IS
       UNREASONABLE ...................................................................................... 19

III. CONCLUSION ................................................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Am. Tel. & Tel. Co. v. United States*
  177 F.3d 1368 (Fed. Cir. 1999) ....................................................................7

*Bd. Of Governors of Fed. Reserve sys. v. Dimension Fin. Corp.*
  474 U.S. 361 (1986)..........................................................................................8

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*
  426 F. Supp. 3d 1395 (Ct. Int'l Trade 2020) ..........................................1

*In re City of Houston*
  731 F.3d 1326 (Fed. Cir. 2013)....................................................................7

*Dong-A Steel Co. v. United States*
  475 F. Supp. 3d 1317 (Ct. Int'l Trade 2020) ................................. *passim*

*Husteel Co. v. United States*
  426 F. Supp. 3d 1376 (Ct. Int'l Trade 2020) ................................. *passim*

*Husteel Co. v. United States*
  476 F. Supp. 3d 1363 (Ct. Int'l Trade 2020) ....................................1, 4

*Jinan Yipin Corp. v United States*
  526 F. Supp. 2d 1347 (Ct. Int'l Trade 2007) .......................................18

*LMI-La Metalli Indus., S.p.A. v. United States*
  912 F.2d 455 (Fed. Cir. 1990)......................................................................18

*Robinson v. Shell Oil Co.*
  519 U.S. 337 (1997).........................................................................................7

*Saha Thai Steel Pipe Pub. Co. v. United States*
  422 F. Supp. 3d 1363 (Ct. Int'l Trade 2019) ....................................1, 4

*Saha Thai Steel Pipe Pub. Co. v. United States*
  476 F. Supp. 3d 1378 (Ct. Int'l Trade 2020) ..........................................1

*Schwegmann Bros. v. Calvert Distillers Corp.*
  341 U.S. 384 (1951).........................................................................................7

*SeAH Steel Corp. v. United States*
  Slip. Op. 21-43, Consol. Court No. 19-00086 (Ct. Int'l Trade Apr. 14, 2021) .............. *passim*

*Secs. & Exch. Comm'n v. Chenery Corp.*
  332 U.S. 194 (1947)....................................................................................11

*Thomas v. Nicholson*
  423 F.3d 1279 (Fed. Cir. 2005)..................................................................6

*Universal Camera Corp. v. NLRB*
  340 U.S. 474 (1951)...................................................................................20

*Vincentin S.A.I.C. v. United States*
  404 F. Supp. 3d 1323 (Ct. Int'l Trade 2019) ...........................................7

**Federal Statutes**

19 U.S.C. § 1677(15) ....................................................................................6, 8

19 U.S.C. § 1677(15)(c) ...................................................................................12

19 U.S.C. § 1677b ...........................................................................................11

19 U.S.C. § 1677b(a) ....................................................................................2, 11

19 U.S.C. § 1677b(b) ................................................................................ *passim*

19 U.S.C. § 1677b(b)(3) ....................................................................................4

19 U.S.C. § 1677b(e) ................................................................................ *passim*

19 U.S.C. § 1677b(f) ........................................................................................11

**Commerce Determinations**

*Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final
  Results of Countervailing Duty Administrative Review, 2016*, 84 Fed. Reg.
  28,461 (Dep't Commerce June 19, 2019) .................................................16

*Countervailing Duty Order on Certain Hot-Rolled Steel Flat Products from the
  Republic of Korea: Amended Final Results of the First Administrative Review*,
  84 Fed. Reg. 35,604 (Dep't Commerce July 24, 2019) ............................16

*Large Diameter Welded Pipe from the Republic of Korea: Final Determination of
  Sales at Less Than Fair Value*,
  84 Fed. Reg. 6,374 (Dep't Commerce Feb. 27, 2019) ...............................9

## I.       INTRODUCTION

In their response briefs, Defendant United States and Defendant-Intervenors Wheatland

Tube Company and Nucor Tubular Products Inc. (collectively "Defendant-Intervenors") do not

articulate sufficient justification to explain Commerce's unreasonable application of a particular

market situation ("PMS") adjustment to the calculation of Plaintiff NEXTEEL Co., Ltd.

("NEXTEEL")'s antidumping margin performed under the sales-below-cost test in this twenty-

sixth administrative review of the antidumping duty order covering circular welded non-alloy

steel pipe ("CWP") from the Republic of Korea.  Instead, Defendant and Defendant-Intervenors

emphasize Commerce's discretion to interpret the PMS statute, largely restate Commerce's

unsupported conclusions, and mischaracterize NEXTEEL's arguments.

As a preliminary matter, this Court's repeated holdings – that Commerce's authority to

apply a particular market situation adjustment is limited to constructed value calculations

performed under 19 U.S.C. § 1677b(e) – entirely foreclose Defendant's and Defendant-

Intervenor's arguments.  *See Saha Thai Steel Pipe Pub. Co. v. United States,* 422 F. Supp. 3d

1363, 1368–70 (Ct. Int'l Trade 2019); *Husteel Co. v. United States,* 426 F. Supp. 3d 1376, 1383–

89 (Ct. Int'l Trade 2020); *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States,*

426 F. Supp. 3d 1395,1411–12 (Ct. Int'l Trade 2020); *Dong-A Steel Co. v. United States,*

475 F. Supp. 3d 1317, 1337 (Ct. Int'l Trade 2020); *Husteel Co. v. United States,* 476 F. Supp. 3d

1363, 1370 (Ct. Int'l Trade 2020); *Saha Thai Steel Pipe Pub. Co. v. United States,* 476 F. Supp.

3d 1378 (Ct. Int'l Trade 2020).  The defendant parties attempt to dismiss this persuasive line of

cases, a matter which this Court in its prior holdings has essentially handled as a settled matter of

CIT jurisprudence.  *See, e.g., Borusan Mannesmann,* 426 F. Supp. 3d at 1411–12 ("The Court

will not discuss this matter in great detail as in recent and thorough opinions the court has

explained that no adjustment for a PMS is permitted for the sale below cost test.").  Neither

Defendant nor Defendant-Intervenors offers any persuasive arguments to override this line of case law.

Defendant also argues that the PMS provision in the TPEA amendments does not require a company-specific assessment of the company's costs, but instead requires simply a general market-based assessment of distortion.  This argument entirely ignores the plain language of the statute, which requires Commerce to determine whether an individual exporter's "subject merchandise is being . . . sold at less than fair value" by comparing that exporter's "export price or constructed export price and normal value."  *See* 19 U.S.C. § 1677b(a).  In other words, it is the determination of whether the costs of an individually-examined exporter no longer "reflect{} the cost of production in the ordinary course of trade."  To do so, the statute necessitates that Commerce assess whether the costs at issue do not accurately reflect costs in the ordinary course of trade.  Absent this finding, Commerce simply cannot apply any PMS adjustments.

The defendant parties also argue that substantial evidence supports Commerce's finding that a PMS exists in Korea with respect to hot rolled steel coil ("HRC") inputs used in the production of subject CWP.  However, Defendant relies heavily on the fact that Commerce "undertook a cumulative analysis based on the totality of the circumstances and record evidence pertaining to each of the {four} factors," Def.'s Resp. to Pls.' Mots. J. Agency Record at 24, ECF No. 40 (June 11, 2021) ("Def. Resp."), which is to say, not based squarely on any one of the four alleged circumstances that Petitioner presented as evidencing a PMS.  As demonstrated by the nature of Defendant's argument, Commerce did not rely in particular on any of those factors and, indeed, emphasized that none of the factors on its own could support such a finding.  As NEXTEEL presented in its moving brief and establishes here again, that reasoning is flawed and

renders the entire finding unsupported.  Indeed, this Court has already squarely rejected Defendant's approach in multiple proceedings, and should do so again here.

Further, the evidentiary record relied upon by Commerce in the instant case is very similar, if not identical, to the evidentiary record that was before Commerce in the OCTG and Line Pipe proceedings, as well as the record in prior reviews of the Circular Welded Pipe order. The Court has already examined these facts several times and consistently found them insufficient, either individually or collectively, to support Commerce's PMS determinations. Here again, the record does not contain evidence of a PMS that results in NEXTEEL's costs being outside the ordinary course of trade.

For its part, Defendant-Intervenors argue that their global regression-based methodology purporting to calculate a hypothetical HRC price itself is yet further evidence of a PMS (a theory Commerce has not articulated in any of the agency's decision materials).  They claim that the output from their regression model shows a hypothetical HRC price that is higher than actual Korean import AUVs.  But such analysis is inherently inconsistent with the basic premise that a PMS exists within Korea.  Global excess steel capacity is a factor that impacts the global market, and as such is not unique to Korea (or any other country for that matter).  Therefore, the globalized architecture of a regression model, which analyzed the relationship between a theoretical global excess steel capacity and a country's steel import AUVs for 38 different countries – and assumed the relationship between each country and the excess capacity variable is the same – simply indicated that there is no market situation "particular" to Korea.  As NEXTEEL presented in its moving brief and establishes here again, the regression-based methodology is deeply flawed and in appropriate as both evidence of PMS and to adjust NEXTEEL's HRC costs.

## II.    ARGUMENT

### A.    CONSISTENT WITH THE STATUTE AND COURT PRECEDENT, COMMERCE CANNOT APPLY PMS TO COSTS FOR PURPOSES OF THE SALES-BELOW-COST TEST

In their response briefs, Defendant and Defendant-Intervenors largely dismiss this Court's well-reasoned and consistent interpretation of Commerce's authority for purposes of the sales-below-cost test of 19 U.S.C. § 1677b(b).  As summarized in *Husteel*, the Court held that the statute "does not authorize particular market situation adjustment to the cost of production when Commerce applies the sale-below-cost test." *Husteel*, 476 F. Supp. 3d at 1370.  Despite this Court's consistent interpretation of the same statutory scheme, Defendant merely posits that "those and other rulings by this court are not binding on the Court in the present case."  Def. Resp. at 26.

While these cases might not be "binding," Defendant ignores the fact that this Court has determined that those earlier decisions are informative and persuasive.  *See, e.g., Dong-A*, 475 F. Supp. 3d 1317 (2020) (finding this Court's prior decisions concerning Commerce's PMS determinations in the OCTG, Line Pipe, and Circular Welded Pipe cases "informative and persuasive.").  As this Court observed in *Saha Thai*, the TPEA did not amend 19 U.S.C. § 1677b(b)(3) defining cost of production; rather it only modified 19 U.S.C. § 1677b(e) defining CV.  For this reason, the Court there held that PMS determinations made under TPEA Section 504 does not authorize Commerce to make PMS adjustments outside the scope of a price-to-constructed value calculation.  *Saha Thai*, 422 F. Supp. 3d at 1368.  Similarly, in *Husteel*, the Court held that "nothing in the statutory scheme . . . can be read to grant Commerce the authority to modify the below cost test to account for a PMS.  Indeed, the statute *precludes* a PMS adjustment to {cost of production} for the below cost sales analysis." *Husteel,* 426 F. Supp. 3d at 1387 (emphasis added).

      1.     **Defendant's and Defendant-Intervenors' Statutory Interpretation is Directly Inconsistent with Significant CIT Case Law and Basic Principles of Statutory Interpretation**

Defendant argues that the TPEA "generally expanded the meaning of 'ordinary course of trade' to include any situation in which Commerce finds that a particular market situation prevents a proper comparison between markets."   Def. Resp. at 27.  According to Defendant, the definition of ordinary course of trade "carries through to the subsection (b) normal value provisions concerning sales below cost" and thus, where Commerce determines that a particular market situation exists it may use "any" alternative cost calculation methodology, including for purposes of the sales-below-cost test of Section 1677b(b).  *Id*.  Defendant-Intervenors take a step further and argue that once Commerce finds a PMS, the statute "unambiguously provides Commerce with the authority to use 'any other' calculation methodology."  Resp. Br. of Def.-Ints. at 7, ECF No. 41 (June 1, 2021) ("DI Resp.").  This Court has previously addressed and rejected the same arguments.  *See, e.g., Dong-A*, 475 F. Supp. 3d at 1339 ("the TPEA limited its definition of 'outside the ordinary course of trade' to those '{s}ituations in which the administering authority determines that the {PMS} prevents a proper comparison <u>with the export price or {CEP}</u>") (emphasis in original).

Despite the clear statutory scheme prescribing when Commerce can or cannot use "any other calculation methodology" where it finds a PMS, Defendant and Defendant-Intervenors advance arguments that directly contravene the plain language of the statute.  In particular, Defendant argues that

> the language used in §§ 1677b(e)(1) and 1677b(b)(3)(A) incorporating the concept of ordinary course of trade/business is *almost identical* for purposes of calculating cost of production in the constructed value contest and for purposes of the sales-below-cost context respectively.  Therefore, because there is nothing expressly prohibiting this interpretation, it is reasonable for Commerce both to interpret section 1677b(e)(1) to allow for a PMS adjustment to costs and to apply the same interpretation to *nearly identical language* in section 1677b(b)(3)(A).

Def. Resp. at 28 (emphasis added). *See also* DI Resp. at 10-11 (raising the same argument that "{n}early the exact same language is used to define the first element in the calculation of COP for the sales-below-cost text."). This argument relying on "almost identical" or "nearly identical" language in the statue operates only to concede the fact that Commerce overstepped its authority when it relied on particular language not found in section 1677b(b)(3)(A). *See Thomas v. Nicholson*, 423 F.3d 1279, 1284 (Fed. Cir. 2005) ("where 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion'") (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)). In *Dong-A*, the Court found this argument – that Congress implicitly authorized PMS determination and corresponding PMS adjustment to all portions of the statute that cite to 19 U.S.C. § 1677(15) – unsupported under both cannons of statutory construction and CIT precedent. *See Dong-A*, 475 F. Supp. 3d at 1319.

As this Court held, the PMS provision of 19 U.S.C. § 1677b(e) explicitly limits its own application *only to the calculation of constructed value within 19 U.S.C. § 1677b(e)*. *See Husteel*, 426 F. Supp. 3d at 1388 ("No part of the {TPEA} allows Commerce to use 'any other methodology' when market sales are used for normal value. The 'any other methodology' language is *reserved solely for when normal value is determined by constructed value*."). That limitation, to the constructed value calculation of § 1677b(e), is explicit – the phrase says "For purposes of paragraph (1)" and not "For purposes of paragraph (1) and any other paragraph or statutory provision Commerce deems appropriate." It was within this context that the Court, contrary to Defendant-Intervenors' argument, *see* DI Resp. at 7-8 (arguing that this Court "has determined that the provision does not direct Commerce to a particular calculation methodology

once a PMS is found"), that Commerce may 'use any calculation methodology' to calculate constructed value where a PMS exists." *Vincentin S.A.I.C. v. United States,* 404 F. Supp. 3d 1323, 1335 (Ct. Int'l Trade 2019).

Dissatisfied with the Court's consistent interpretation of section 1677b(e), Defendant suggests that this Court "should consider the totality of the statute in light of the TPEA amendments." Def. Resp. 30. As an initial matter, the premise of Defendant's suggestion that the Court consider the "totality" of the statute would require there to be some ambiguity in the statute that in turn requires reading back to legislative history to determine the intent of Congress. However, as Defendant correctly notes, *see* Def. Resp. at 29, this Court has already held that *Chevron* deference is not warranted in the context of a PMS adjustment for the sales-below-cost test because the "plain language of the statute prohibits Commerce's action." *See Husteel*, 426 F. Supp. 3d at 1383. In this context, any consideration of legislative history is also not applicable.

Indeed, there is no ambiguity in the statute. Absent some ambiguity in the statute, there is no basis for Commerce to look beyond the statutory text (as Defendant suggests in its response brief. *See* Def. Resp. at 31.). *See, e.g., Robinson v. Shell Oil Co.,* 519 U.S. 337 (1997) ("Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" (quoting *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 240 (1989)); *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 395–96 (1951) (Jackson, J., concurring) ("Resort to legislative history is only justified where the face of the Act is inescapably ambiguous."); *In re City of Houston*, 731 F.3d at 1333; *Am. Tel. & Tel. Co. v. United States*, 177 F.3d 1368, 1381–82

(Fed. Cir. 1999) (Plager, J., concurring in part) ("{A} prerequisite to judicial use of legislative history, even relevant legislative history, is a finding that the statute at issue is ambiguous.").

Further, Defendant's reliance on the purpose of the statute where, as here, express terms in the statute direct a specific action by Commerce is squarely at odds with the purpose of statutory interpretation as articulated by the Supreme Court. *See Bd. Of Governors of Fed. Reserve sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 373-74 (1986) ("Invocation of the 'plain purpose' of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.") (citations omitted).  Here, the statutory definition of "ordinary course of trade" within 19 U.S.C. § 1677(15) does not indicate that Congress intended the PMS provision to apply to the sales-below-cost test of 19 U.S.C. § 1677b(b).  Again, the phrase "particular market situation" is referenced only within 19 U.S.C. § 1677b(e), in the context of the constructed value calculations. As such, the statute very clearly does not align with Defendant's preferred interpretation. Defendant's view that the reference to "ordinary course of trade" in the constructed value provision of 19 U.S.C. § 1677b(e) somehow indicates that the statute allows a PMS adjustment for purposes of the sale-below-cost test is unpersuasive in light of the plain text of the statute.

There is only one way to read the plain language of the statute as written, and Defendant's preferred interpretation of the statute cannot overcome the unambiguous fact that the PMS provision in 19 U.S.C. § 1677b(e) applies to section 1677b(e) and section 1677b(e) alone.  Here, the plain language of the statute is binding.

### 2. Defendant Has Not Demonstrated that the PMS Analysis is In Accordance with Law

Defendant argues that the PMS provision in the TPEA amendments does not require a company-specific assessment of the company's costs, but instead requires simply a general

market-based assessment of distortion.  *See* Def. Resp. at 15-16.  Relying on a single Commerce

determination, Defendant claims that "input prices (*i.e.,* production costs) do not need to be

found to be outside the ordinary course of trade to find the existence of a PMS."  *See id* at 16

(citing *Large Diameter Welded Pipe from the Republic of Korea: Final Determination of Sales at

Less Than Fair Value*, 84 Fed. Reg. 6,374 (Dep't Commerce Feb. 27, 2019)).  Put differently,

Defendant essentially argues that once Commerce finds that a market is distorted, the relevant input

prices in that market are automatically outside of the course of trade.  *Id.*

    Defendant's argument cannot be sustained as a matter of law.  The statute provides that,

when calculating constructed value under the TPEA, if Commerce finds the existence of a PMS

"such that the cost of materials and fabrication or other processing of any kind does not

accurately reflect the cost of production in the ordinary course of trade, the administering

authority may use another calculation methodology under this part or any other calculation

methodology."  19 U.S.C. § 1677b(e).  In other words, the statute allows for adjustment to cost

where there is (1) some situation in the market at issue that constitutes a "PMS" and (2) the PMS

results in "the cost of materials and fabrication or other processing of any kind" no longer

"reflect{ing} the cost of production in the ordinary course of trade{.}"  19 U.S.C. § 1677b(e).

*See also Husteel,* 426 F.Supp.3d at 1390 ("To establish the existence of a PMS, Commerce must

demonstrate both that there are distortions present in the market and that those distortions

prevent a proper comparison of normal value with export price or constructed export price.").

    In Defendant's view, item (2) is essentially removed from the statute, as any time there is

a PMS, then the costs are automatically deemed outside the ordinary course of trade, at

Commerce's sole discretion without regard to the data before it.  The statute requires two

findings, and Commerce has not made both findings here.  NEXTEEL submits that an analysis

of NEXTEEL's own data is the most logical approach but, here, Defendant has not addressed the second component of the statute in any manner.

The entire assessment under the statute is geared towards effectuating a comparison between *a respondent's* normal value (comparison prices or constructed value) and export price (or constructed export price), to calculate *that respondent's* antidumping margin.  The respondent-specific nature of normal value and constructed value are so inherent to the provisions, they are implicit.  Within the context of the constructed value provision of the normal value statute, Commerce must make an assessment that the costs at issue -- *i.e.,* respondent's costs -- are outside the ordinary course of trade.  Only then does the statute provide that Commerce may use an alternative methodology to calculate constructed value.  19 U.S.C. § 1677b(e).  Absent such a finding of distortion in those actual costs, Commerce has no basis to adjust those costs.

Despite the considerable focus on this argument in NEXTEEL's moving brief, Defendant provides no additional insight into Commerce's approach, other than citing to a single Commerce determination.  *See* Def.'s Resp. at 16.  There is no debate that the phrase "particular market situation" represents a circumstance in which Commerce determines that a market as a whole is distorted, and that the analysis must take into account market factors.  But Defendant's arguments collapse two distinct aspects of the statute.  While the term "particular market situation" certainly refers generally to market conditions, the statute provides that Commerce determine that the market is distorted from a particular market situation "such that" *i.e.,* to the extent that, or when, "the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade."  19 U.S.C. § 1677b(e).

10

The only information on the record pertaining to "the cost of materials and fabrication" are the respondents' own individual costs.  To determine that the PMS affects these costs without actually looking at or analyzing the costs is illogical and contrary to the terms of the statute.  In any event, such a determination must, at a minimum, consider record data in order to make an assessment of actual costs to produce the subject merchandise.

19 U.S.C. § 1677b(a) establishes that, "{i}n determining under this subtitle whether subject merchandise is being, or is likely to be, sold at less than fair value, *a fair comparison shall be made between the export price or constructed export price and normal value*."  That "fair comparison" is between the company's export price and the company's normal value.  Each subsequent reference to certain aspects of that calculation within provision 19 U.S.C. § 1677b is specific to the respondent's experience in producing/exporting subject merchandise.  Provision 19 U.S.C. § 1677b(f), "Special rules for the calculation of cost of production and for the calculation of constructed value," further confirms that "costs" as used in 1677b(e) refers to the costs of the respondent company under investigation or review, stating that, "for purposes of subsection{n} . . . (e)," *i.e.,* the constructed value provision, in general:

> Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise.

19 U.S.C. § 1677b(f).

Defendant does not explain how the determination that the costs are outside the ordinary course of trade is to be made in the absence of assessing the respondent's own costs.  This is contrary to the agency's obligations.  *Secs. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947) (explaining that the basis for agency action "must be set forth with such clarity as to be understandable," and that a reviewing court may not guess at the agency's theory, nor can it

"be expected to chisel that which must be precise from what the agency has left vague and indecisive.").

While Commerce made no finding that NEXTEEL's costs are outside the ordinary course of trade, Commerce also did not find that the alleged distortion in costs of production would prevent a proper comparison between NEXTEEL's constructed value and its export price.  As NEXTEEL established in its moving brief, Commerce did not make two distinct determinations but instead collapsed the two into one summary conclusion that "the acquisition prices of HRC in Korea, are distorted and, *thus*, demonstrate that the costs of HRC to Korean CWP producers are not established in the ordinary course of trade."  *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 77,055 (Dep't Commerce Nov. 6, 2020), and accompanying Issues and Decision Memorandum ("Final IDM"), P.R. 247, at 17.  The missing, requisite explanation as to how the allegedly distorted costs prevent a fair comparison is replaced with the word "thus," as if one follows from the other.

As the Court held in *Husteel*, Commerce's determination there was lacking because "Commerce fails to explain how these distortions prevent a proper comparison."  *Husteel*, 426 F. Supp. 3d at 1391.  There the Court noted that the various PMS factors, if accepted, would appear to have an equal impact on normal value and export price.  *Id.* ("Commerce does not address whether costs would be lowered on both sides of the less than fair value equation.").  Even accepting Commerce's logic here – that production costs are artificially lowered – Commerce has not addressed why such lowered costs cannot be used as a benchmark comparison against U.S. price in the calculations.  *See* 19 U.S.C. § 1677(15)(c).  That is, even if there is a PMS, the PMS does not impact Commerce's calculations as it would appear to lower

both costs and sales prices, such that Commerce could still engage in a proper comparison in the calculations.

Defendant seeks to defend Commerce's decision by arguing that Commerce did what was required under the statute.  *See* Def.'s Resp. at 15-16.  These arguments are unpersuasive.

**B.    DEFENDANT'S AND DEFENDANT-INTERVENORS' ARGUMENTS ON COMMERCE'S PMS DETERMINATION ARE FLAWED ON THE RECORD OF THIS CASE**

As an initial matter, since the moving briefs were filed, this Court has issued an opinion in *SeAH Steel Corp. v. United States*, Slip. Op. 21-43, Consol. Court. No. 19-00086 (Ct. Int'l Trade Apr. 14, 2021) (pertaining to OCTG III) ("*SeAH*"), which is of significance here.  In *SeAH*, the Court reviewed Commerce's determination based on much of the same evidence Commerce relied on to make a PMS determination in the administrative review at hand.  The Court first explained at length, pointing to specific evidence relied upon by Commerce, why Commerce's PMS determinations were unsupported by substantial evidence in *NEXTEEL I* (pertaining to OCTG I) and *NEXTEEL II* (pertaining to OCTG II).  *Id*. at 30-39.  Then the Court analyzed whether any additional or different evidence relied on by Commerce to make a PMS finding in OCTG AR3 supported an affirmative PMS finding.  *Id*. at 39-52.  The Court concluded that, "{a}lthough the record in OCTG III contains some additional documents not included on the OCTG I or OCTG II records, the court observes that Commerce's examination of the OCTG III record overall, including previously submitted documents and newly submitted documents, with related explanation, *does not support Commerce's OCTG III determination that a particular market situation affected the cost of production of OCTG.*"  *Id*. at 39 (emphasis added).

In particular, with respect to the alleged countervailable subsidization of Korean hot-rolled steel products, the Court found that "Commerce's reliance on a subsidization rate of nearly

60% from a timeframe outside the relevant period of review is unreasonable in light of existing contrary record information referenced by Commerce of significantly lower subsidization rates of less than 2% from within the period of review." *Id.* at 43. As to the alleged "onslaught of imported 'cheaper Chinese steel products'" in the Korean steel market, the Court observed that the record evidence cited by Commerce "does not support a conclusion that the global glut of Chinese hot-rolled coil imports caused price distortions *specific to the Korean steel market*." *Id.* at 46. As to the evidence such as a notice from the Korean Free Trade Commission imposing penalties to certain Korean steel producers to show that "strategic alliances" existed during the POR, the Court found that "none of the evidence pertains to the relevant period of review," and Commerce's speculation that strategic alliances "may have created distortions" was not supported by the record. *Id.* at 48. With respect to electricity, the Court found that the evidence relied upon by Commerce had a "temporal problem" and that the evidence that pre-dated the POR was "inconclusive regarding government control over electricity" during the OCTG III period of review. *Id.* at 50.

As NEXTEEL demonstrates herein, Defendant and Defendant-Intervenors point to the same evidence this Court has examined and found to be insufficient to support a PMS determination and claim that "NEXTEEL's disagreement with Commerce's conclusion does nothing to negate the record evidence upon which Commerce relied," Def. Resp. at 19, or that NEXTEEL's arguments lack merit because "those cases were based on different records than record in this review." DI Resp. at 14. However, Commerce's PMS determination remains unsupported by substantial evidence, despite Defendant's and Defendant-Intervenors' arguments in support.

1. **<u>Subsidization</u>**

As an initial matter, while Defendant argues that this Court should not reweigh the evidence Commerce relied upon when determining the existence of subsidization, *see* Def Resp. at 19, Defendant-Intervenors on the other hand point to record evidence purporting to show additional evidence that *would have supported* Commerce's determination.  *See* DI Resp. at 17-18 (listing exhibits contained in Petitioners' PMS Allegation, P.R. 80-155 (July 15, 2019)).  The fact of the matter is that Commerce relied solely on its final countervailing duty determination in *Hot-Rolled Steel from Korea* to determine that "the Korean government provides subsidies for the production of hot-rolled steel, which includes HRC to produce CWP," *see* Prelim IDM at 12, P.R. 203, and the Court found that the *Hot-Rolled Steel from Korea* determination simply does not constitute substantial evidence supporting a PMS determination.  Indeed, reviewing Commerce's reliance on the *Hot-Rolled Investigation* rate in *SeAH*, the Court found that reliance unreasonable:

> Commerce's reliance on the subsidy rate of nearly 60% or the revised subsidy rate of more than 40% from the {*Hot-Rolled Investigation*} countervailing duty investigation covering calendar year 2014 was unreasonable in light of available information of more contemporaneous subsidy rates of less than 2% for the period of review from August 12, 2016 to December 31, 2016, which overlaps partially with the OCTG III period of review from September 1, 2016 through August 31, 2017.

*SeAH* at 41.

As in *SeAH*, Commerce here ignored the fact that the AFA rate in the *Hot-Rolled Investigation* does not indicate actual level of subsidization in Korea during the POR.  Here, too the available information that "more contemporaneous subsidy rates" were less than 2% for the period of review at hand from November 1, 2017 to October 31, 2018, and such near *de minims* level of subsidization is far from being so extreme and pervasive as to find that the Korean hot rolled steel market was affected by a "particular market situation."  *See Certain Hot-Rolled Steel*

*Flat Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review, 2016*, 84 Fed. Reg. 28,461 (Dep't Commerce June 19, 2019), *as amended* in *Countervailing Duty Order on Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Amended Final Results of the First Administrative Review*, 84 Fed. Reg. 35,604 (Dep't Commerce July 24, 2019) (collectively, *Hot-Rolled Steel from Korea AR1*)*; see also* Respondents' Rebuttal PMS Comments at Exhibit CAP-18 (containing final decision memorandum and calculation memoranda in connection with *Hot-Rolled Steel from Korea AR1*), C.R. 130, 134-146, P.R. 182-196.

## 2.      Korean Imports of HRC from China

Defendant defends Commerce's determination that HRC imports from China contributed to a PMS in Korea during the POR.  Def. Resp. at 21 (citing to Final IDM at 14, P.R. 247).  Again, *SeAH* is instructive here as the Court laid out what should be the relevant inquiry in light of the statutory mandate.  Specifically, the Court focused on whether Commerce made a finding, supported with record evidence, that the alleged "global glut of Chinese hot-rolled coil imports *caused price distortions specific to the Korean steel market*."  *SeAH* at 46 (emphasis added).  This "specificity" and any measure of impact on NEXTEEL's HRC acquisition costs due to Chinese imports were precisely missing when Commerce determined that imports from China had "a distorting effect on the domestic Korean price of HRC."  Def. Resp. at 21.

## 3.      Strategic Alliance

Defendant argues that "{r}ecord evidence further demonstrated the existence of strategic alliances between certain Korean hot-rolled steel coil suppliers and Korean CWP producers that *may* have ultimately affected the prices of hot-rolled steel coil in Korea."  Def. Resp. at 21 (emphasis added).  Leaving aside the fact that Defendant's own use of the word "may" confirms that Commerce's conclusion is mere speculation, this Court has already reviewed the same

evidence in *SeAH* on which Commerce again relied in this review and found it insufficient to support Commerce's determination.

Defendant argues that Commerce reasonably found that "strategic alliance and price fixing schemes . . . {were} relevant as an element of Commerce's particular market situation." *Id*. at 22.  Specifically, as Defendant points out, Commerce relied on the December 21, 2017 notice from KFTC, entitled "*KFTC punishes six steel pipe manufacturers for rigging bids offered by Korea Gas Corporation*"; an article in the Korea Times, dated December 20, 2017, titled "*Steelmakers fined W92 bil. For bid rigging*"; and Korean Fair Trade Commission Decision Nos. 2017-081, 98-134, and 97-45.  *See* Def. Resp. at 22 (citing Final IDM, P.R. 247, at 15).  In *SeAH*, the Court examined the identical evidence and found that "{t}he record documents cited by Commerce relate to findings of unfair corporate action that occurred in 2014 or earlier, and no evidence relates to unfair corporate action or other strategic alliances during the relevant period of review."  *SeAH* at 48.  Because none of the evidence pertained to the relevant period of review, the Court concluded that "Commerce's purely speculative conclusions that strategic alliances 'may have created distortions' and 'may continue to impact {hot-rolled coil} pricing in a distortive manner …' were not supported by the record.  *Id*.

The Court should reach the same determination here.  The period of review of the case at hand is from November 1, 2017 through October 31, 2018.  Any alleged action that occurred in 2014 or earlier has no relevance as to any alleged "strategic alliances" three years later during the POR between hot-rolled coil producers and their pipe-producing customers.  Commerce did not indicate how a price-fixing scheme *among pipe producers*, years earlier, affected the market for *hot rolled steel coil* during the POR such that it contributed to a particular market situation. Commerce's speculation simply does not constitute substantial record evidence and, therefore,

cannot withstand judicial scrutiny.  *See, e.g., LMI-La Metalli Indus., S.p.A. v. United States*, 912 F.2d 455, 460 (Fed. Cir. 1990) (explaining that an agency's "speculation . . . must yield to evidence"); *Jinan Yipin Corp.*, 526 F. Supp. 2d 1347, 1375 (Ct. Int'l Trade 2007) (remanding where Commerce's decision was based on "mere assumptions, which find no apparent support in record evidence").

### 4.    Electricity

Finally, Defendant tries to defend Commerce's determination with respect to the alleged distortion in electricity price in Korea during the POR but fails to articulate how this determination is supported by substantial evidence.  While Defendant notes that Commerce determined that "the Korean government has tight control over the electricity market, including supply and pricing," Def. Resp. at 23, Defendant cannot articulate as to what extent the Korean government's "control over" the Korean electricity market had any specific impact on NEXTEEL's cost of production.  In this regard, Defendant and Defendant-Intervenors downplay NEXTEEL's argument that Commerce has in recent countervailing duty determinations found that the Korean government does not provide electricity for less than adequate renumeration. *See* Def. Resp. at 23; DI Resp. at 19.  However, this evidence is very much relevant in Commerce's PMS inquiry, because it shows that NEXTEEL's electricity costs reflect market price that is untainted by a countervailable subsidy.  If Korean electricity prices "cannot be considered to be competitively set," as Defendant-Intervenors claim, *see* DI Resp. at 19-20, Commerce in its numerous countervailing cases involving the same electricity provider, KEPCO, would have affirmatively found that the Korean government provides electricity at less than adequate renumeration.  Defendant-Intervenors also try to draw a distinction by arguing that just because Commerce may have found that the Korean government did not confer subsidies providing specific benefits to particular users within Korea in the countervailing duty context, it

does not mean that the same intervention does not contribute to distorted production costs in the antidumping context.  *See* DI Resp. at 20.  This argument ignores the fact that Commerce failed to conduct any meaningful, analytical analysis to determine whether the alleged intervention contributed to "distorted production costs."  Commerce performed no analysis whatsoever as to whether NEXTEEL's electricity costs were distorted or outside the ordinary course of trade, let alone what the potential impact on NEXTEEL's costs might have been.

At bottom, by relying on prior determinations in other cases to reach the same conclusion without undertaking any reasoned, fact-based empirical analysis of the market conditions and NEXTEEL's costs during the review at hand, Commerce's final results are devoid of any evidentiary support.  While this Court's decisions on Commerce's prior PMS determinations may not be binding, they are influential and persuasive in finding that Commerce's PMS determination in the review at hand lacks substantial evidence.  *See Dong-A*, 475 F.Supp.3d at 1334 (finding this Court's prior decisions concerning Commerce's PMS determinations OCTG and Circular Welded Pipe lines of cases "informative and persuasive.").

## C.      COMMERCE'S USE OF A REGRESSION MODEL TO ADJUST FOR PMS IS UNREASONABLE

Defendant's main argument supporting Commerce's use of a regression model is that, because the statute allows Commerce to use "any other calculation methodology," Commerce lawfully exercised its discretion to use a methodology with data as it saw fit.  *See* Def. Resp. at 32-33.  Again, the statute does not permit Commerce to make any cost adjustment for purposes of the sales-below-cost test of 19 U.S.C. § 1677b(b).  In other words, the argument that Commerce may use "any other calculation methodology" to adjust respondents' costs under section 1677b(b) must fail.

Even assuming *arguendo* that Commerce was permitted to make a cost adjustment under § 1677b(b), this Court has held that Commerce's chosen methodology is bound by reasonableness. *Vicentin,* 404 F. Supp. 3d at 342. Defendant and Defendant-Intervenors do not meaningfully address NEXTEEL's arguments that Commerce's global regression-based model was so unreasonable such that it could not be used for any calculation adjustment purpose. For instance, with respect to Commerce's reliance on outdated 2017 data, Defendant repeats Commerce's unreasonable justification arguing that the updated data was unavailable to Petitioners when they filed the PMS allegation. *See* Def. Resp. at 35. To be clear, as the regulations require, when Commerce accepted Petitioners' PMS allegation, it invited parties to submit rebuttal factual information, and Commerce obtained the updated 2017 data for the record. *See* Respondents' Rebuttal PMS Comments at Exhibit CAP-3, C.R. 130, 134-146, P.R. 182-196; *see also* NEXTEEL's Case Brief at 55, C.R. 160, P.R. 224. With respect to the 2018 data, Defendant again repeats Commerce's explanation for not using data that covered 10 months of the 12-month POR. *See* Def. Resp. at 36. Because the capacity and production data were critical in Commerce's calculation of the PMS adjustment factor, overlooking the relevant data alone warrants a finding that Commerce's PMS adjustment factor calculation was unsupported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight").

In sum, Commerce's chosen methodology, *i.e.,* a global regression-based model to "estimate" what NEXTEEL's hot-rolled steel input costs would have been absent the claimed PMS, was unreasonable, because it bore no reasonable relationship to the costs NEXTEEL incurred to produce subject CWP. Commerce's model was based on unreasonable assumptions

as NEXTEEL detailed in its moving brief, omitted critical data sets, and contained stale data, especially where the agency had all record information to cure these defects.  Commerce's calculation of a particular market situation adjustment is thus unsupported by substantial record evidence.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, NEXTEEL respectfully requests that this Court hold Commerce's *Final Results* to be unsupported by substantial evidence and otherwise not in accordance with law.  NEXTEEL further requests that this Court remand the agency's determination with instructions to Commerce to correct its errors and to provide such other relief as this Court deems just and appropriate.

Respectfully submitted,

 /s/ J. David Park

J. David Park
Henry D. Almond
Daniel R. Wilson
Leslie C. Bailey
Kang Woo Lee

*Counsel to NEXTEEL Co., Ltd.*
*Plaintiff*

Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, D.C.  20001
Phone:  (202) 942-5000
E-mail:  David.Park@apks.com

**Dated:  July 1, 2021**

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES

_____

| | |
|---|---|
| NEXTEEL CO., LTD., | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| HYUNDAI STEEL COMPANY, and SEAH STEEL | ) |
| CORPORATION, | ) |
| | ) |
| *Consolidated Plaintiffs,* | ) |
| | ) |
| and | ) |
| | ) |
| HYUNDAI STEEL COMPANY, | ) |
| | ) |
| *Plaintiff-Intervenor,* | ) |
| v. | ) Consol. Court No. 20-03868 |
| | ) |
| UNITED STATES, | ) |
| | ) |
| *Defendant,* | ) |
| | ) |
| and | ) |
| | ) |
| WHEATLAND TUBE COMPANY and NUCOR | ) |
| TUBULAR PRODUCTS INC., | ) |
| | ) |
| *Defendant-Intervenors.* | ) |

_____

## CERTIFICATE OF COMPLIANCE WITH CHAMBERS PROCEDURE 2(B)(1)

The undersigned hereby certifies that the attached Reply Brief in Support of Plaintiff

NEXTEEL Co., Ltd.'s Rule 56.2 Motion for Judgment Upon the Agency Record, filed on July 1,

2021, contains 6,373 words, exclusive of the table of contents, table of authorities, and counsel's

signature block, according to the word count function of the word-processing system used to

prepare this memorandum, and therefore complies with the maximum 7,000 word count

limitation set forth in the Court's Chambers Procedures.

By: /s/ J. David Park
J. David Park

**Dated:  July 1, 2021**